2419

W.E. ANTHONY, Sr., D.L. Cannon, J.T. Craig, W.L. Carpenter, J.A. Flanagan, L.D. Freeman, R.S. Gaddis, J.T. Gressette, T.A. Kingsmore, C.F. McElrath, R.E. McKinnell, N.M. Perrin, R.L. Smith, W.V. Hughes, III, JES Properties Limited, a South Carolina Limited Partnership, Individually and Derivatively on behalf of JES Properties Limited, a South Carolina Limited Partnership, Respondents v. PADMAR, INC., Kenneth R. Padgett, Jr., and Fred M. Martin, Appellants.

(465 S.E. (2d) 745)

Court of Appeals

438

*O.G. Calhoun* and *Jesse C. Belcher*, both of *Haynsworth, Marion, McKay & Guerard*, Greenville, *for appellants.*

*William H. Thomas, III*, of *Dobson, Jones & Layman*, Greenville; and *Paul E. Tinkler*, of *Wallace & Tinkler*, Charleston, *for respondents.*

Heard May 2, 1995.

Decided Nov. 13, 1995; Reh. Den. Jan. 25, 1996.

CURETON, Judge:

This is the second appeal of this derivative action involving the conduct of the general partners of JES Properties Limited (JES), a South Carolina Limited Partnership, in selling all of the assets of the partnership. On behalf of the partnership, fourteen limited partners sued the two general partners, the management corporation owned by the general partners, Padmar, Inc., and the purchaser of the assets, Horsham-BVI, alleging six causes of action: (1) breach of the partnership agreement; (2) fraud; (3) negligence; (4) breach of fiduciary duties; (5) breach of the management agreement by Padmar; and (6) violation of the South Carolina Uniform Securities Act.

In our prior decision, *Anthony v. Padmar, Inc.*, 307 S.C. 503, 415 S.E. (2d) 828 (Ct. App. 1992), we upheld the sale to Horsham on the ground the limited partners were estopped to deny the validity of the sale because Horsham relied upon their conduct and acquiescence to its detriment both before and after the closing. We, thus, reversed the trial court's denial of summary judgment to Horsham, but preserved the limited partners' causes of action against the general partners and Padmar.[1] The issue of the actual authority of the general partners to consummate the sale of the partnership's assets

[1] The appealed order is predicated only upon three of the six causes of action, breach of the partnership agreement, breach of the management agreement, and breach of fiduciary duties.

was remanded to the trial court with instructions to specifically consider the "validity of [the altered and challenged Facey] ballot and its effect on the issue of actual authority." 307 S.C. at 512, 415 S.E. (2d) at 834. We also remanded the issue of whether the limited partners were estopped to question the actions of the general partners in the sale of the assets, and whether the limited partners ratified the general partners conduct. 307 S.C. at 513, 415 S.E. (2d) at 834.

On remand, the trial judge held the general partners breached both the partnership and management agreements and also their fiduciary duties to the limited partners. He found the general partners lacked the actual authority to sell the partnership's assets to Horsham because they failed to receive the required majority vote from the limited partners. He further concluded the general partners violated their fiduciary duties to the limited partners by intentionally failing to disclose material information, misrepresenting and manipulating the voting process, and by the manner in which they conducted the sale to Horsham. Since the general partners failed to disclose the significance of the Facey ballot to the limited partners, the judge held the general partners' defenses of ratification and estoppel were inapplicable. Consequently, the judge found the general partners jointly and severally liable to the partnership for damages in the amount of $6,768,162. This figure represents the difference between the net economic value of the transaction received by the partnership and the fair market value of the partnership's assets at the time of closing. The general partners appeal.

On appeal the following issues are presented for review: (1) our scope of review; (2) whether the general partners violated terms of the partnership and management agreements in obtaining approval for the sale; (3) whether the general partners breached their fiduciary duties to the limited partners in the manner in whether they obtained approval for and in effectuating the sale; (4) whether the limited partners are estopped to contest the balloting process and whether they ratified the sale by accepting the proceeds of the closing; (5) whether the general partners should be absolved and/or indemnified from liability under provision of the partnership and management agreements; and (6) whether the damages are supported by the evidence. We affirm as modified.

## 1. *FACTS*

To evaluate the conduct of the general partners, it is important that we point out the circumstances of the partnership at the operative periods of time preceding the sale of its assets to Horsham. JES (the partnership) was formed in 1983 by the management of J.E. Sirrine Company as a result of the acquisition of most of the assets of Sirrine by CRS Company.[2] CRS refused to acquire Sirrine's real estate holdings and assume its mortgage debt; consequently, the partnership was formed to purchase these real estate assets from Sirrine. The office buildings acquired by the partnership in the real estate purchase were leased back to Sirrine following its acquisition by CRS for a term of 10 years expiring July 30, 1993 (collectively referred to as "Sirrine Leases"). The lease payments were fixed at artificially high (above market) rates, designed to cover the partnership's expenses including its monthly mortgage payments on the office buildings. The rentals were not sufficient, however, to enable the partnership to meet all of its operational expenses or to make the 7.5 million dollar balloon mortgage payment due April 1, 1993. The partnership experienced "every day" cash flow problems.

Accordingly, the general partners were receptive when approached in June 1986 by Horsham, a British Virgin Island Corporation which expressed interest in purchasing all of the partnership's assets. Negotiations between the general partners and Horsham ensued over a period of several months. The general partners reported all developments to William Carpenter, the former CEO of Sirrine and a respondent in this action. When Horsham finally made an offer, the general partners held meetings with Carpenter and other limited partners who held top-level management positions at Sirrine. The consensus at the meetings was overwhelmingly in favor of proceeding with the sale.

In November of 1986, the negotiations finally resulted in a contract. Assisted by the partnership's attorney and CPA, the general partners negotiated an Agreement For Purchase and Sale of Assets with Horsham which the parties executed on November 3, 1986.[3] The contract was contingent upon the ap-

---

[2] After the transaction, CRS became known as CRS/Sirrine Company.

[3] Upon the recommendation of special legal counsel to the partnership, the general partners engaged a national appraisal firm, Enterprise Appraisal Co.,

proval of more than one-half of the limited partners pursuant to the terms of the partnership agreement. The general partners submitted the contract to the limited partners for their approval in early 1987.

Prior to the vote on the question of approval of the sale to Horsham, the general partners prepared and sent to the limited partners a Solicitation Statement[4] setting forth in great detail the particulars of the proposed sale. The Solicitation Statement revealed that since inception, the partnership's most serious problem had been a weak cash position, as its mortgage debt represented approximately 84% of the apprised value of its assets. It further stated the partnership's major source of income was the Sirrine Leases, which were not structured to fully cover its operational costs, or the costs associated with improving, maintaining and developing its properties. Since its formation, the partnership had covered these operating deficits through a combination of debt refinancing, the sale of some of its land, and borrowing from rent deposits that had not yet been earned. Finally, the Solicitation Statement concluded with a recommendation that all limited partners' consent to the sale because converting the partnership's assets into a cash distribution and a secured receivable would be in the limited partners' best interests and better serve their needs.

Attached to the Solicitation Statement was a ballot. The top portion of the ballot provided places for the limited partners to mark their "consent to the sale," "withhold consent to the

---

to determine the fair market value of the partnership's properties to be sold, and whether the agreement was "fair." Enterprise physically inspected each of the partnership's real properties and rendered its formal Appraisal and Fairness Opinion affirming that the agreement was fair to the partnership in relation to the value of its properties.

[4] According to the statement, the solicitation of the limited partners' consent to the sale was governed by the Security Exchange Commission regulations. The Securities Exchange Commission rules prohibit solicitation by means of a communication containing a statement which is either false or misleading with respect to a material fact, or which fails to state a material fact necessary in order to make the communication not false or misleading. A misrepresentation results in a violation of the rules only if it involves a material fact. Materiality is a matter to be determined from all relevant facts and circumstances. The misrepresentation must have a significant propensity to affect the voting process. The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. 79A C.J.S. *Securities Regulation* § 233 (1995).

sale," or "abstain." Following these choices was a statement indicating that by consenting to the sale, the limited partners authorize the general partners to consummate the sale substantially in accordance with the terms of the sales agreement. The statement further provided the general partners discretion "to amend the sales agreement to the extent that the aggregate amount of cash and the purchase money note to be received by the partnership is reduced by [no] more than 5%." At the bottom of the ballot was a place for the limited partner to sign.

Prior to the vote, the general partners also held meetings with groups of limited partners in Greenville, S.C., Raleigh, N.C., and Houston, Tx. to explain the terms of the proposed sale. At the Greenville meeting, one of the limited partners asked whether the discretionary authority of the general partners could be further limited by writing a qualification on the ballot. In the presence of the general partners, W. Lindsay Smith, attorney for the partnership, advised the inquiring limited partner that he would recommend to the general partners that any ballot containing a condition or limitation be counted as a "no" vote. The general partners present at this meeting did not comment on the question, nor did they object to the explanation.

Moreover, a limited partner who was unable to attend the Greenville meeting went to Smith's office prior to the meeting to discuss the sale, When he arrived, one of the general partners was also present. Among the topics the limited partners raised was the 5% discretionary authority granted in the ballot. He informed Smith and the general partner that he had mailed in a ballot voting "yes," but had written some qualifications on it. In the general partner's presence, Smith told him his ballot would be counted as a "no" vote. As a result, the limited partner then cast another ballot in favor of the sale without any limitations.

The voting closed, and the ballots were counted by Smith and an accounting firm on March 11, 1987. At that time, Smith discovered that a ballot cast by one of the limited partners, W.S. Facey, had been altered. Facey had modified the discretionary authority of the general partners by changing the percentage from 5% to 2%. The status of the Facey ballot determined the outcome of the vote. If the Facey ballot were

counted as a "no" vote, the proposed sale would have failed; if counted as a "yes" vote, a majority of 50.3% in favor of the sale would be realized.

Smith notified securities attorney Menzie of the modified ballot, and requested his opinion as to how it should be counted. Smith related to Menzie his statement at the Greenville meeting, but made no recommendation to Menzie as to how to count the ballot. After studying the matter, Menzie advised Smith the ballot should be counted as a "yes" vote, provided the limitation imposed by Facey was met at closing. Accordingly, the Facey ballot was tabulated as a "yes" vote, and Smith certified to Horsham the sale had been approved by the requisite majority of limited partners.

The limited partners were notified of the results by letter dated March 17, 1987, indicating the tabulations had been certified by both a law firm and accounting firm. No mention was made, however, that those certifications were contingent on the Facey ballot being counted as a conditional "yes" vote. During the five-month period between the vote and the closing, the general partners never disclosed to the limited partners anything about the Facey ballot. The day after receiving the results, a group of limited partners made an appointment with Smith "to help some of the concerned limited partners understand the final results of the balloting and some conditions regarding it." Although Smith gave the group detailed information about the balloting process, he did not mention the Facey ballot.

At the closing on August 17, 1987, Horsham's representative told the general partners Horsham would refuse to go forward with the closing unless the general partners obtained from CRS/Sirrine Company a guarantee of the obligations of J.E. Sirrine Company under the terms if J.E. Sirrine's lease with the partnership.[5] The general partners attempted to ob-

---

[5] During negotiations, both JES and Horsham were under the impression that CRS and J.E. Sirrine, Inc. had merged, whereby CRS/Sirrine had become the legal tenant under the Sirrine leases. Shortly before closing, however, they learned that CRS had, instead, first acquired Sirrine's assets, except its real estate holdings which were transferred to JES, and thereafter its stock, leaving J.E. Sirrine, Inc. a "shell" corporation. Horsham's demand for a guarantee of the obligations of J.E. Sirrine by CRS/Sirrine was ostensibly based on its concern that while CRS/Sirrine was the de facto tenant, it was not legally the tenant and might not honor the lease.

tain such a guarantee, but CRS/Sirrine representatives refused to provide it or acknowledge liability under the Sirrine leases. Therefore, Horsham demanded a price reduction of $500,000. Ultimately, the general partners agreed to a settlement whereby the price to be paid by Horsham was reduced by $200,000, of which $100,000 would be deducted from the sum to be received by the partnership and $100,000 deducted from the commission to be received by Padmar. Padmar also agreed to guarantee Horsham $500,000 of future lease payments as they became due under the Leases.

The sale then closed, and the cash proceeds of sale were distributed to and accepted by all of the limited partners.

## II. *STANDARD OF REVIEW*

The general partners contend this is a derivative action, cognizable in equity and thus this court may find facts in accordance with our view of the preponderance of the evidence. *Pelfrey v. Bank of Greer*, 270 S.C. 691, 244 S.E. (2d) 315 (1978) (holding a shareholder's derivative action, even where the only relief allowed is a recovery of damages, is nevertheless a suit in equity and not an action at law).

Conversely, the limited partners argue *Pelfrey* is inapplicable because it dealt with a corporate shareholder's derivative suit, whereas, this case arises out of the South Carolina Uniform Limited Partnership Act. They further argue since there was no provision in the historic courts of equity permitting a derivative action on behalf of a limited partnership, the determination of whether this case is one "at law" or "in equity" should be made by referring to the nature of the remedy sought. Inasmuch as they seek only monetary damages, the limited partners maintain this case should be labeled as one "at law," citing *O'Shea v. Lesser*, 308 S.C. 10, 416 S.E. (2d) 629 (1992).

We agree with general partners that our scope of review is in equity. Section 33-42-1810 of the South Carolina Code of Laws Annotated (1990) permits a limited partner to pursue a derivative suit "in the right of a limited partnership" to secure judgment "in its favor if general partners . . . have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." The limited partners' pleadings denominate this action as a derivative action

and the general partners' response admits "this action is brought derivatively on behalf of the partnership." Furthermore, in their brief, the limited partners contend this action is brought on behalf of the partnership.

Their complaint basically asserts the conduct of the general partners caused the assets of the partnership to be sacrificed. Because the loss asserted is a partnership loss,[6] the limited partners may properly pursue only a derivative remedy on behalf of the partnership. *Re v. Weksel*, 130 A.D. (2d) 640, 515 N.Y.S. (2d) 568 (1987); *R.S. Ellsworth, Inc. v. AMFAC Fin. Corp.*, 652 P. (2d) 1114 (Haw. 1982); *see generally* Wax, Deba E., *Right of Limited Partner to Maintain Derivation Action on Behalf of Partnership*, 26 A.L.R. 4th 264 (1983) (discussing whether or under what circumstances a limited partner can bring a derivation action on behalf on the partnership); *cf. Ward v. Griffin*, 295 S.C. 219, 367 S.E. (2d) 703 (Ct. App. 1988) (suit alleging damages resulting from waste, mismanagement and improper control of corporation was derivative in nature). Having chosen a derivative suit, the limited partners may not now on appeal attempt to limit our review to that of a law action. *See Pelfrey*, 270 S.C. 691, 244 S.E. (2d) 315 (shareholder's derivative action is equitable and triable by the court even if corporation would have been entitled to a jury trial had it brought the action).

## III. *DISCUSSION/ANALYSIS*

### A. *Breach of Contractual and Fiduciary Duties*

The partnership agreement required the general partners to obtain the consent of the limited partners holding more then one-half of the then-outstanding partnership interests before consummating the sale of the partnership's assets. At the heart of this controversy is the limited partners' contention that the Facey ballot was incorrectly counted as a

---

[6] We note the limited partners' complaint states: "[p]laintiffs assert their right to bring this action derivatively on behalf of the partnership as well as on behalf of the individual Plaintiffs." In its order, the court found the general partners "breached both their fiduciary duties and contractual duties to the plaintiffs, who are suing derivatively on behalf of the JES Limited Partnership. I find the Partnership suffered damages. . . ." The award of damages is solely to the partnership. Moreover, the limited partners have not demonstrated how the loss is personal to them as opposed to the partnership. *See Todd v. Zaldo*, 304 S.C. 275, 403 S.E. (2d) 666 (Ct. App. 1991).

"yes" vote and, thus, the general partners sold the property without actual authority in violation of both the management and partnership agreements since they failed to receive the required majority vote. Furthermore, because the general partners obtained approval for the sale by intentionally failing to disclose material information, and misrepresenting and manipulating the voting process, the limited partners contend they also beached their fiduciary duties.

The trial judge found the partnership attorney's statement that he would "recommend" that any ballot containing a condition be counted as a "no" vote became a part of the balloting rules and bound the general partners accordingly. Relying on *Paramount Comm. v. QVC Network, Inc.*, 637 A. (2d) 34 (Del. 1994), the judge further concluded the general partners' duty to inform the limited partners and represent their interests did not end with the dissemination of the Solicitation Statement; rather, that duty continued through the presale period. Despite this continuing duty to inform and deal fairly with the limited partners, the judge found the general partners improperly counted the Facey ballot as a "yes" vote and intentionally withheld information relating to the voting process. Thus, the general partners caused then partnership to sell its property without actual authority, breaching both their fiduciary and contractual duties owed to the limited partners.

On appeal, the general partners contend the trial judge's finding that they was bound to follow the recommendation announced by the partnership's attorney at the Greenville meeting is patently erroneous. Instead, they maintain Smith's recommendation was a mere expression of his opinion that a conditional ballot should be considered a "no" vote, and was not meant to bind the general partners.

The limited partners respond that the general partners had a duty to correct Smith's answer if they disagreed with it. Being fiduciaries, the general partners had a duty to speak; thus, their failure to object was tacit approval of the partnership attorney's recommendation, and they are estopped from denying the existence of the balloting rule announced at the Greenville meeting prohibiting altered ballots. In support of this contention, the limited partners rely on *Southern Dev. Land and Golf Co. v. S.C. Pub. Serv. Auth.*, 311 S.C. 29, 426 S.E. (2d) 748 (1993). In that case, our Supreme Court held:

[e]stoppel by silence arises where a person owing another a duty to speak refrains from doing so and thereby leads the other to believe in the existence of an erroneous state of facts. Silence, when it is intended, or when it has the effect of misleading a party, may operate as equitable estoppel. There is no requirement that the person whose silence misleads another have actual knowledge of the true facts if circumstances are such that knowledge is necessarily imputed to him. Negligence will take the place of the intent to deceive when there is a duty to disclose. (Citations omitted.)

We agree with the limited partners that the general partners had a duty to disclose all pertinent information relating to the voting process. The parties were all partners in limited partnership. The relationship of partners is fiduciary and partners are held to high standards of integrity in their dealings with each other. The scope of the fiduciary duty has been variously defined as one requiring utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing.[7] *See generally* Robert B. Robbins, *Fiduciary Duties of Directors of Corporate General Partners to Limited Partnerships*, C993 A.L.I.-ABA 509 (1995) (the nature of the fiduciary obligations among partners is rigid and absolute; there can be no doubt that a general partner owes fiduciary duties to his limited partners).

The duty of a general partner in a limited partnership to ex-

[7] Courts from other jurisdictions have variously applied the fiduciary duty, the business judgment rule, and breach of contractual duty standards to the conduct of a general partner vis-a-vis his limited partners. 59A Am. Jur. (2d) *Partnership* § 1335 *et. seq.* (1987); *see Wyler v. Feuer*, 85 Cal. App. (3rd) 392, 149 Cal. Rptr. 626 (1978) (applied the business judgment rule); *Roper v. Thomas*, 60 N.C. App. 64, 298 S.E. (2d) 424 (1982) (refused to apply the business judgment standard to the actions of general partners because the duties of the general partners were set out in the partnership agreement, and general partners clearly breached those duties); *Appletree Square I Limited Partnership v. Investmark, Inc.*, 494 N.W. (2d) 889 (Minn. Ct. App. 1993) (applied strict fiduciary standard); *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 635 A. (2d) 798 (1994) (applied a modified fiduciary standard so that the determinative consideration was whether the general partners dealt fairly with the limited partners). Here, the trial court evaluated the general partners' conduct under the strict fiduciary standard, and on appeal, the general partners have not excepted to the imposition of this standard. Therefore, it is the law of the case. Rules 207(b)(1)(B), (D) and 210(b), SCACR; *Biales v. Young*, 315 S.C. 166, 432 S.E. (2d) 482 (1993).

ercise the utmost good faith, fairness and loyalty is required both by statute, *see e.g.*, S.C. Code Ann. § 33-41-540 (1990) (partner is accountable as a fiduciary), and common law, *see e.g., Few v. Few*, 239 S.C. 321, 122 S.E. (2d) 829 (1961) ( partners are treated as fiduciaries each to the other; their relationship is one of mutual trust and confidence, imposing upon them the usual trust requirements of loyalty, good faith and fair dealing).

■ Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud. *Cf. Manning v. Dial*, 271 S.C. 79, 245 S.E. (2d) 120 (1978) (defendant stood in fiduciary relationship to the plaintiff, and as such he had a duty to disclose all relevant facts when purchasing plaintiff's stock); *see also Jacobson v. Yaschik*, 249 S.C. 577, 155 S.E. (2d) 601 (1967)[8] (nondisclosure becomes fraudulent when it is the duty of the party having knowledge of the facts to uncover them to the other); *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W. (2d) 619 (Minn. 1972) (where a fiduciary relationship exists, silence may constitute fraud); *accord Shell Petroleum, Inc. v. Smith*, 606 A. (2d) 112 (Del. 1992) (where defendant fiduciary argued it had no reason to know that a particular disclosure was inaccurate and therefore actionable, the court, nevertheless, held the defendant culpable because it found the defendant had "control" over the preparation of the disclosure at issue and therefore "should have known about the error"); *Vogel v. Brewer*, 176 F. Supp. 892 (E.D. Ark. 1959) (transactions between partners, if they are to stand, must be characterized by the utmost good faith and a full disclosure of all material facts known to one of the partners and unknown to the

---

[8] In *Jacobson*, 155 S.E. (2d) at 605, our Supreme Court explained:

The duty to disclose may be reduced to three distinct classes: (1) where it arises from a preexisting definite fiduciary relationship between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties.

other); *Klotz v. Klotz*, 202 Va. 393, 117 S.E. (2d) 650 (1961) (each partner must guard the interest of other partners as he does his own and must make a frank and full disclosure of all material facts).

By virtue of the general partners' position, the limited partners must rely upon the general partners' scrupulous performance of their duty to fully inform and represent the limited partners to the best of their abilities. The general partners' duty with respect to disclose is clear. They had a duty to exercise reasonable care in furnishing information to the limited partners, especially since they had a pecuniary interest in the transaction. *Winburn v. Ins. Co. of North America*, 287 S.C. 435, 339 S.E. (2d) 142 (Ct. App. 1985). Moreover, because of their fiduciary obligations and their conflict of interest due to the large commission they anticipated, the general partners bore the burden of showing complete disclosure of all material facts relevant to the limited partners' decision whether to vote "yes" or "no" to the sale of the partnership assets. *See Manning*, 271 S.C. 79, 245 S.E. (2d) 120; *Jacobson*, 249 S.C. 577, 155 S.E. (2d) 601. In determining whether the general partners complied with this disclosure requirement, it need not be shown that the general partners' omissions or acts would have changed the way the limited partners voted on the sale or their overall view of the transaction; rather, it is enough to show that the fact in question, i.e., how modification of the discretionary authority provision would be treated, would have been relevant to the limited partners in making a decision on the vote. *See Shell Petroleum*, 606 A. (2d) at 114 (complete disclosure is required of all material facts; a fact is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.").

It is clear the general partners knew prior to the start of voting that some of the limited partners had been given the impression they could not, consistent with voting for the sale, also modify the discretionary authority stated in the ballot. It is equally apparent the general partners permitted the vote to proceed knowing the ballot modification question was either unresolved or it had, in fact, been determined that no modification of the ballot would be allowed

as intimated by attorney Smith at the Greenville meeting.[9] Therefore, the general partners had a duty either: (1) to determine the unsettled issue and accurately inform the limited partners of the effect of a modification of the discretionary authority provision, or (2) if a decision had been made relative to the counting of modified ballots, to adhere to that decision. In any event, the general partners were not free to permit the issue to remain sufficiently muddled, then utilize the situation to effect a majority vote for the sale by counting a modified ballot differently from the announced method for the sole purpose of obtaining the result they desired.

Accordingly, we conclude the general partners' acts and omissions in either: (1) permitting the limited partners to rely and base their voting decision on an inaccurate and defective disclosure, or (2) failing to comply with the predetermined decision to count a conditional vote as a "no" vote, amounts to a breach of their fiduciary duty to the limited partners and the partnership.[10] When the question is one of the general partners' breach of fiduciary duty to the partnership, concepts of reasonableness and good faith have no application; the severity of the breach will not be examined; the only question is whether there has been a breach at all. 59A Am. Jur. (2d) *Partnership* § 1335 (1987).

Thus, in fairness to those limited partners who voted in favor of the sale believing they could not vote for the sale and at the same time modify their ballots as to the discretionary authority, and in keeping with the general partners' fiduciary duty to deal fairly, openly and honestly with all partners, we conclude the general partners are estopped from counting the Facey ballot as a conditional "yes" vote. We, accordingly, af-

---

[9] The discretionary authority provision in the ballot was an important issue to the limited partners as well as a point of hot contention. Concern over this provision surfaced prior to and at the duly noticed partnership meeting in Greenville.

[10] The trial court also found the general partners breached their fiduciary and contractual duties by: (1) manipulating the voting process through extension of the balloting deadline when there were insufficient votes in favor of the sale; (2) using insider information in their lobbying efforts and canvassing for votes among undecided limited partners; (3) personally meeting with and receiving the vote of a major limited partner in the final hour of balloting; (4) selling the property too cheaply; (5) renegotiating the sales price; and (6) not disclosing other significant facts to the limited partners. Standing alone, we find these matters do not amount to a breach of fiduciary duties; however, they buttress our finding of breach of fiduciary duty.

firm the trial court's ruling that the general partners sold the partnership's assets without actual authority in violation of their contractual and fiduciary duties.[11]

## B. *Estoppel and Ratification*

Even if they did not have actual authority to sell the assets of the partnership, the general partners argue their lack of authority is excused by the limited partners' failure to contest the voting process and their ratification of the sale. The trial court held the defenses of estoppel and ratification were unavailable to the general partners. Since the limited partners were not appraised of material facts, the court ruled they cannot be held to have ratified the sale by accepting the proceeds of the closing. Likewise, estoppel must be founded on a full knowledge of the facts, and since the trial court found the limited partners did not have full knowledge, it concluded the general partner's defense of estoppel also fails.

The essential elements of estoppel are: (1) ignorance of the party invoking it of the truth as to the facts in question; (2) representations or conduct of the party estopped which misled; (3) reliance upon such representation or conduct; and (4) prejudicial change of position as a result of such reliance. *Standard Fire Ins. Co. v. Marine Contracting and Towing Co.*, 301 S.C. 418, 392 S.E. (2d) 460 (1990). Since the general partners were clearly in a superior position of knowledge to that of the limited partners, and they have not shown any conduct of the limited partners they relied in to their detriment, we find the defense of estoppel is without merit.

The case of *Lincoln v. Aetna Cas. & Sur. Co.*, 300 S.C. 188, 386 S.E. (2d) 801 (Ct. App. 1989), sets forth the three essential elements necessary to prove ratification. They are: (1) acceptance by the principal of the benefits of the agent's acts; (2) *full* knowledge of the facts; and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangements. *Id.* 386 S.E. (2d) at 803. (Emphasis added). In view of our finding concerning the general partners' breach of their fiduciary duties to the lim-

---

[11] Because the general partners secured the vote through a breach of their fiduciary duty, the Facey ballot must be disregarded and, thus, the sale occurred without the necessary authority required in the partnership agreement.

ited partners in failing to disclose material information, we also find the defense of ratification to be without merit.

## C. *Indemnification*

The general partners next contend they should be indemnified or absolved from liability pursuant to either Section 8.05 or Section 8.07 of the partnership agreement because the judge's order contains no finding of gross negligence, fraud or bad faith.[12]

After thoroughly reviewing the record in this case, we find no indication that this issue was ever ruled on by the trial court. Although the order states "defendants have also counterclaimed under an indemnity provision in the Management Contract with Padmar," this issue is not discussed in the order. Moreover, there is no indication in the record the general partners made a motion requesting the court rule on this issue pursuant to Rule 59(e), SCRCP. Therefore, the issue of indemnification is not preserved for appellate review. *See Tally v. S.C. Higher Educ. Tuition Grants Comm.*, 289 S.C. 483, 347 S.E. (2d) 99 (1986) (an issue must be both raised to and ruled on by the trial court before it can be considered on appeal). Furthermore, the issue of indemnification was not remanded to the trial court pursuant to the prior decision in this case. *Anthony v. Padmar, Inc.*, 307 S.C. 503, 415 S.E. (2d) 828 (Ct. App. 1992).

---

[12] Sections 8.05 and 8.07 of the partnership agreement provide:

8.05 *Liability of General Partners*. The General Partners shall not be liable or accountable to the partnership or to any of the Partners, in damages or otherwise, for any error or [sic] judgment, for any mistake of fact or of law, or for any other act or thing which they, or the agents of the General Partners, may do or refrain from doing in connection with the business and affairs of the partnership except in the case of willful misconduct, gross negligence, or fraud or bad faith in failing to perform their duties hereunder.

8.07 *Indemnification of a General Partner*. The partnership does hereby agree to indemnify and hold the General Partners and their duly authorized agents wholly harmless from and against any loss, expense, or damage suffered by them or any of them by reason of anything they may do or refrain from doing hereafter for and on behalf of the partnership and in furtherance of its stated purposes; provided, however, that the partnership shall not be required to indemnify the General Partners for any loss, expense, or damage which it or they might suffer as a result of willful misconduct, gross negligence, fraud, or bad faith in failing to perform their duties hereunder.

## D. *Damages*

Finally, the general partners appeal the trial court's damage award of $6,768,162, arguing it is not supported by the evidence. The general partners concede the trial judge used the proper method for calculating the damages to the partnership, the difference between the fair market value of the partnership's assets at the time of closing (August 17, 1987) and the net economic value the partnership received as a result of the sale. They contend, however, the judge erred in determining both values.

The trial court found the fair market value of the real estate to be $29,670,000 and added the partnership's cash account as of closing totalling $776,000 for a gross value of the partnership property as of August 17, 1987 in the amount of $30,446,000. It then deducted a real estate commission (cost of selling the property) of $1,300,000 to arrive at the net fair market value of the partnership's assets—$29,146,000.

The trial court then calculated what the partnership received from Horsham pursuant to the contract to arrive at the net economic value received by the partnership. The purchase price was $7,847,765 and assumption of the amount of the mortgage loans on the partnership properties as of the date of closing. The court found the sum of the mortgage liabilities assumed by Horsham was $15,082,969. The undisputed evidence establishes, however, that the mortgage liabilities owed by the partnership and assumed by Horsham were actually $16,384,852, a difference of $1,301,883. The limited partners concede the trial court erred in selecting an incorrect mortgage balance and agree that a reduction of the verdict by the sum of $1,301,883 is proper.[13]

The general partners maintain this adjustment alone does not cure the problem with the damage award because the trial court used a flawed appraisal to arrive at the damage figure. In determining the fair market value of the partnership's assets, the court adopted an appraisal introduced by the limited

---

[13] The general partners further contend at the time of closing the partnership had non-mortgage liabilities of $1,253,843, which were assumed by Horsham, and which should have been considered in determining the net economic value received by the partnership pursuant to the sale. Thus, the general partners argue a reduction in the verdict in the amount of the conceded error of $1,301,883 plus another $1,253,843 for the nonmortgage liabilities is required. The limited partners do not challenge this assertion in their brief.

partners and prepared by Bruce Owen. The Owen Appraisal, however, valued the partnership's real estate "as of December 1, 1986," over eight months prior to the closing on August 17, 1987. Although this appraisal, as alleged by the limited partners, coincides with the date of the signing of the sales agreement and the date of the "fairness opinion" obtained by the general partners, the operative date for determination of the fair market value of the partnership property was the date of closing, August 17, 1987, as found by the trial court.[14]

In support of the contention that the Owen appraisal did not accurately reflect the fair market value of the partnership's real estate at the time of closing, the general partners point to Owen's testimony wherein he indicated there were significant market changes between the time he prepared his appraisal and the closing date. When Owen was questioned as to why some of his December 1, 1986 appraisal projections had not proved to be correct at the time of closing, Owen testified:

> Well I think that in 1986 . . . everybody had their rose colored glasses on and we were thinking . . . it would never end and then the market sort of went south on us and as a result office space absorption slowed down to almost negative points. . . . So in general the market really went down significantly and as a result if there's no demand for office space there's not typically a lot of demand for office land.

Having concluded the time of closing is the operative date from which to determine fair market value and calculate the damages to the partnership, we find the trial court erred in

---

[14] In its order, the trial judge stated:

> Plaintiffs have presented two alternative measures for calculating the damage to the partnership. The first method . . . is the difference between the fair market value at the time of closing and the "contract price". . . . The second measure of damages propounded by the plaintiffs was the "benefit of the bargain" measure. . . . I have chosen the first measure of damages as the appropriate one in this case.

The limited partners, while implicity conceding the property may have declined in value after December 1986, seem to suggest the December 1986 date is appropriate for valuation purposes because the sales agreement "fixed" the consideration at that point. This argument is flawed in view of our finding that a valid contract was never entered into by the general partners with Horsham. Because no valid contract existed, the operative date for valuation is the date the general partners actually sold the partnership's property without authority.

basing damages upon the Owen appraisal. Instead, the court should have relied upon the appraisal prepared by James H. Robinson, which valued the property as of July-August 1987.

In rejecting the Robinson appraisal, the trial court found:

> Robinson's appraisal was hampered in that the defendants failed to provide him with the critical fact that the RTP property had been sold shortly after the closing for a significantly higher value than the value Robinson provided. Robinson was also unaware that the general partners had knowledge as of the date of closing that Horsham had prearranged sales of other partnership property. I have great respect for Robinson as an appraiser. However, he was not fully informed of important facts that clearly bear on the issue of fair market value. I therefore find that the Owen appraisal of $29,670,000 represents the fair market value of the partnership's real estate holdings as of the date of the sale to Horsham.

While we agree that an adjustment to Robinson's appraisal is warranted, we, nevertheless, find his appraisal more reliable since it was fairly contemporaneous with the closing date and took into account the downward trend of the office market prior to closing. Robinson testified the value of the partnership's real estate was just under $23,000,000 at the time of closing.

As noted by the limited partners in their brief, much of the difference between the Owen and Robinson appraisals lies in their valuation of the undeveloped land in Greenville and the RTP property in Raleigh. As relates to undeveloped land in Greenville, Robinson valued it at $4,124,855, while Owen valued it at $6,600,000.[15] The record reflects, however, that Horsham resold approximately 65% of the undeveloped property for $5,200,000 a day after closing, and retained the other 35% of the undeveloped land. Because Owen's $6,600,000 valuation of the undeveloped land in Greenville better reflects its fair market value,[16] we reject Robinson's appraisal only as pertains

---

[15] Both appraisers utilized the comparable sales approach in arriving at their values.

[16] Fair market value has been generally defined as the most probable price in terms of money which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimuli.

to this land and adopt Owen's opinion of value. Accordingly, we add $2,475,145 to Robinson's aggregate value of the partnership's real estate to adjust for his undervaluation.

As relates to the RTP property, although the Owen and Robinson appraisals were markedly varied, both were based on the income approach which determines the value of property according to its income producing capabilities.[17] Owen assigned a market value of $6,120,000 to the RTP property as of December 1986, while Robinson concluded the value of the RTP property in August 1987 was $5,290,343.[18] The difference between the values assigned by each appraiser arises in part from their disagreement over the square footage which could be rented, their differing views on the feasibility of converting the building, and their net income projections for the building.

Notwithstanding these factors, the limited partners contend Robinson's appraisal was unreliable because it was based on incomplete information. Specifically, he did not consider the fact that two weeks before the August closing, Horsham accepted an offer to resell the RTP property to the Burroughs Wellcome Company for $7,706,000.[19] We disagree with the limited partners that the Owen appraisal on its face would appear to be more indicative of market value because of the resale price of $7,706,000. We observe that while both Owen and Robinson based their values on the income being generated from the existing leases, the Burroughs offer was contingent upon Horsham obtaining from CRS/Sirrine a termination of its leases on the property and Horsham delivering title to the property to Burroughs "free and clear of any encumbrances or liens." We simply have no conception of what was involved in

---

[17] More specifically, the income approach utilizes market rentals as well as the historical rents for the subject property to arrive at an economic rent. After an economic rent is established, expenses are deducted and a net income is derived. This net income or anticipated annualized income stream is then capitalized into an indication of value based upon an appropriate rate thought to be reflective of investors' demands for return on and return of their capital investment.

[18] Enterprise Appraisal Company, the national appraisal firm hired to review the purchase agreement and to determine the fair market value of the partnership's real property prior to the sale, rendered its Formal Appraisal and Fairness Opinion on January 30, 1987, valuing the RTP property at $5,100,000.

[19] This contract was ultimately closed the early part of 1988. There is no indication Robinson knew of this sale.

accomplishing this.[20] It would therefore be speculative of us to accept the resale price to Burroughs as the best indicator of value.

In summation, we conclude the trial court erred in awarding damages based upon Owen's opinion of value as of December 1, 1986, since this was not the operative date for determining fair market value. Taking our own view of the preponderance of the evidence, we adopt Robinson's appraisal with some modifications:

### VALUE OF PARTNERSHIP ASSETS

| | |
|---|---|
| Fair Market Value of Partnership Real Estate per Robinson | $ 23,000,000 |
| Adjustment to Value of Undeveloped Land in Greenville | $ 2,457,145 |
| Partnership's Cash | $ 776,000 |
| Net Value of Partnership Property | $ 26,251,145 |

### VALUE RECEIVED FROM SALE

| | |
|---|---|
| Cash and Note | $ 7,847,765 |
| Assumption of Mortgages | $ 16,384,852 |
| Non-Mortgage Liabilities Assumed | $ 1,253,843 |
| Subtotal | $ 25,486,460 |
| (Less interest rate discount) | $ −452,896 |
| (Less price reduction) | $ −100,000 |
| Total Value Received | $ 24,933,564 |

DIFFERENCE: $1,317,581

### IV. *Conclusion*

We therefore affirm the decision of the trial court as to its findings and conclusions that the general partners breached their contractual and fiduciaries duties to the partnership and the limited partners, but modify the damage award to $1,317,581 to reflect: (1) the adjustment made to Robinson's valuation of the undeveloped land in Greenville; (2) the acceptance of Robinson's appraisal instead of Owen's; (3) the elimination of the deduction of the commission cost as a value received by the partnership in view of the fact we have found

---

[20] We observe that there appears in the record a document dated July 30, 1992 reflecting that Horsham paid CRS/Sirrine $1,725,000.00 to effectuate a termination of the lease on the Greenville Patewood property.

the general partners breached their fiduciary duties and in any event are required to account to the partnership for any benefit they derived from that breach;[21] and (4) the conceded mortgage and nonmortgage liabilities the trial court incorrectly calculated.

Affirmed as modified.

SHAW and CONNOR, JJ., concur.

---

[21] *See* S.C. Code Ann. § 33-41-540; 59A Am. Jur. (2d) *Partnership* §§ 443 and 449 (1987).