617 S.E.2d 388

**HISTORIC CHARLESTON HOLDINGS, LLC, Respondent,**

v.

**Gerard MALLON, Dixie Holdings, LLC, and Dixie Developers, LLC, Defendants,**

**Of whom Gerard Mallon is the, Appellant.**

No. 4004.

Court of Appeals of South Carolina.

Heard April 4, 2005.

Decided June 27, 2005.

Rehearing Denied Aug. 26, 2005.

526

528

Deborah Harrison Sheffield, of Columbia, for Appellant.
Charles P. Summerall, IV, of Charleston, for Respondent.

BEATTY, J.:

Gerard Mallon appeals the master-in-equity's order awarding Historic Charleston Holdings, LLC, one-half of the proceeds from the sale of a piece of property owned by Dixie Holdings, LLC, of which both Mallon and Historic Charleston Holdings were members. Additionally, Mallon appeals the master-in-equity's refusal to conduct an accounting, as well as the award of prejudgment interest, attorney's fees, and costs to Historic Charleston Holdings. We affirm in part, reverse in part, and remand.

## FACTS

In June of 1998, Gerard Mallon formed Dixie Holdings, LLC, a member-managed, term limited liability company. Mallon, William Storen,[1] and Historic Charleston Holdings, LLC (HCH) executed an operating agreement as the three members of Dixie Holdings. Priestly Coker and Cynthia Coker were the sole members of HCH.[2] Subsequently, HCH and Mallon also became members in Dixie Developers, LLC. However, HCH ultimately sold its interest to Mallon, leaving Mallon as the sole member of Dixie Developers.

The members formed Dixie Holdings for the purpose of purchasing, renovating, and selling various real properties. Although Dixie Holdings' operating agreement did not specify each member's duties, the record indicates Priestly Coker (Coker) performed accounting and financial related services,[3] Mallon, through his construction company, renovated the properties, and Storen acted as the real estate agent in locating potential investment properties and later marketing them.

---

1. At some point prior to this action, Mallon and HCH bought Storen's interest in Dixie Holdings and Storen filed a Statement of Dissociation with the South Carolina Secretary of State's Office. He was not a party to the underlying action and is not a party in this appeal.

2. From the record, it appears Cynthia Coker did not take an active role in HCH or Dixie Holdings.

3. Coker also performed financial duties for Dixie Developers until the company was sold to Mallon. In fact, both Dixie Holdings and Dixie Developers utilized one banking account under the name of Dixie Developers.

Shortly after the execution of the operating agreement, Mallon, Storen, and Coker on behalf of HCH, amended the operating agreement to reflect the members' interest in Dixie Holdings. This amendment stated Mallon and HCH each owned a 49.5% interest and Storen owned a 1% interest.

Dixie Holdings purchased four properties located in Charleston, South Carolina. According to Mallon, a dispute arose between Mallon and Coker after Dixie Holdings sold two of those properties because Coker failed to provide financial information related to Dixie Holdings and Dixie Developers. Although Mallon had been given money from the proceeds of those sales, he believed he had not separately been compensated for work performed in renovating those properties.

In December 1999, the parties executed a written agreement in connection with a members' meeting that took place several days prior. The agreement provided for an audit of Dixie Holdings and stated if the members could not resolve their differences, then an arbitrator would be appointed by agreement of the parties. In addition, the agreement stated, in pertinent part:

The primary function of the formation of these companies is purchase and sale of Real Estate.

Sales are to be made while these matters are being dealt with.

The sales proceeds can be held in an escrow account. OR [othen [sic] written accepted offer].

Coker gave Mallon a box containing some of the company's financial records in April 2000.

After the execution of this agreement, Dixie Holdings sold the third property, referred to by the parties as "15 Felix Street," on April 14, 2000. Coker testified that, pursuant to the parties' December 1999 agreement, he believed the net proceeds from the sale were to be placed in an escrow account until the parties determined what expenses needed to be paid and Mallon had been compensated for any related expenses. The net proceeds of $41,845.30 were given to Mallon, who placed them in a bank account in the name of Dixie Developers,[4] of which he had sole signatory authority. Despite re-

---

4. Although both Mallon and Coker had signatory authority on the Dixie Developers bank account for both Dixie Holdings and Dixie Developers,

quests from Coker within days of the closing that Mallon place the funds in a proper escrow account, Mallon retained the funds in the separate account and maintained sole signatory authority. As a result, HCH, individually and in a derivative capacity as a member of Dixie Holdings, brought suit against Mallon, Dixie Holdings, and Dixie Developers [5] on October 11, 2002.[6]

In its complaint, HCH alleged five causes of action. HCH requested: (1) a judicial decree winding up and dissolving Dixie Holdings; (2) a full and complete accounting of Dixie Holdings including transfers between it and Dixie Developers and Mallon; (3) injunctive relief reversing Mallon's diversion of funds and restraining Mallon from taking any action that would damage either HCH or Dixie Holdings' interests; (4) a declaratory judgment regarding each member's rights pursuant to section 15–53–10 of the South Carolina Code; and (5) attorney's fees pursuant to section 33–44–1104 of the South Carolina Code. In addition to these causes of action, HCH requested the court award "full relief under Section 33–44–801, an accounting, declaratory relief, injunctive relief, fair distribution, attorney's fees, pre-judgment interest, costs, and such other relief as the Court may deem appropriate."

After the circuit court referred the case to a master-in-equity, Mallon submitted an answer. In his answer, Mallon asserted "an accounting is appropriate for both parties, and that Coker, who acted as the financial officer of Dixie [Holdings] has repeatedly and improperly failed to prepare a proper accounting, which should now be done." Mallon also claimed entitlement to reimbursement for services he performed on various properties of Dixie Holdings that exceeded the proceeds Dixie Holdings received from the sale of 15 Felix Street.

---

Mallon opened a new account in the name of Dixie Developers for which he had sole signatory authority. Further, at the time Mallon opened the new account, he was the sole member of Dixie Developers.

5. Neither Dixie Holdings nor Dixie Developers is a party to this appeal.

6. Dixie Holdings' fourth and final property was sold in December 2001 and the proceeds were split equally. Thus, Dixie Holdings no longer owns any property.

Immediately prior to trial, the master heard several motions in limine submitted by HCH. In one motion, HCH requested the exclusion of any documents not submitted prior to November 21, 2003, when the parties exchanged discovery. The master granted HCH's request. Mallon did not object to the master's decision.

The master proceeded with a trial on the issues raised by the parties. At trial, Mallon presented a statement of charges in which he claimed he was owed $9,280 for work performed on four Felix Street properties, including $1,900 for work performed on 15 Felix Street. In his order, the master denied Mallon's request for an accounting concluding he had "not timely requested, and waived, any right to an accounting." The master also determined Mallon was not entitled to reimbursement for any alleged expenses associated with properties owned by Dixie Holdings or Dixie Developers because the parties had a "course of dealing of determining expenses prior to property sales and paying authorized expenses from the sale proceeds." The master found HCH was entitled to receive one-half of the proceeds from the sale of 15 Felix Street, plus prejudgment interest on its half of the proceeds at the rate of 8.75% from the closing date of 15 Felix Street until the entry of judgment. Finally, the master awarded HCH attorney's fees and costs pursuant to section 33–44–1104 of the South Carolina Code "based upon the record, the Affidavit of Counsel, and the factors applying to an award of fees and costs. . . . "

The master directed Mallon to turn over the proceeds from 15 Felix Street to HCH's counsel to be disbursed to HCH thirty days after the entry of his order. The master also authorized HCH to deliver articles of termination pursuant to section 33–44–805 of the South Carolina Code to the Secretary of State for filing. No post-trial motions were filed, and this appeal followed.

## STANDARD OF REVIEW

In the underlying action, HCH sued in a derivative capacity for an accounting and injunctive relief. Actions for an accounting, for an injunction, and shareholder derivative actions are all actions in equity. *See Lee v. Lee,* 251 S.C. 533,

536, 164 S.E.2d 308, 309 (1968) (holding an action against a guardian ad litem for misappropriated funds was essentially an action for an accounting which was equitable in nature); *Wiedemann v. Town of Hilton Head,* 344 S.C. 233, 236, 542 S.E.2d 752, 753 (Ct.App.2001) ("Actions for injunctive relief are equitable in nature."); *Anthony v. Padmar,* 320 S.C. 436, 445, 465 S.E.2d 745, 750 (Ct.App.1995) (noting that derivative actions are equitable). In an action in equity referred to a master for final judgment, this court may find facts in accordance with its own view of the preponderance of the evidence. *Van Blarcum v. City of N. Myrtle Beach,* 337 S.C. 446, 450, 523 S.E.2d 486, 488 (Ct.App.1999). However, we should not ignore the findings of the trial judge, who had the opportunity to hear and observe the witnesses. *Id.*

## LAW/ANALYSIS

### I. Accounting

 Mallon argues the master erred in refusing to order an accounting because one was necessary prior to the dissolution of Dixie Holdings.[7] We agree.

The Uniform Limited Liability Company Act outlines certain procedures for actions brought by members of a limited liability company. Section 33–44–410 allows a member to maintain an action against the limited liability company or another member "for legal or equitable relief, with or without an accounting" to enforce, in pertinent part:

(1) the member's rights under the operating agreement;

(2) the member's rights under this chapter; and

(3) the rights that otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.

---

7. Mallon also asserts the master erred in limiting the scope of the underlying action to the 15 Felix Street property. However, the substance of the argument in support of the first issue on appeal fails to address why the master erred in limiting the scope of the action to 15 Felix Street. In addition, Mallon fails to cite any supporting authority for his position. Therefore, Mallon abandoned this argument on appeal and we need not address it. *See First Sav. Bank v. McLean,* 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting that where a party fails to city any supporting authority or where the argument is merely a conclusory statement, the issue is deemed abandoned on appeal).

S.C.Code Ann. 33–44–410(a) (Supp.2004). Certain events may cause the dissolution and winding up of a limited liability company, including where a member has applied for dissolution and there is a judicial decree to the effect that:

(a) the economic purpose of the company is likely to be unreasonably frustrated;

(b) another member has engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the company's business with that member;

(c) it is not otherwise reasonably practicable to carry on the company's business in conformity with the articles of organization and the operating agreement;

(d) the company failed to purchase the petitioner's distributional interest after giving effect to provisions of the operating agreement modifying or superseding the provisions of Section 33–77–701; or

(e) the managers or members in control of the company have acted, are acting, or will act in a manner that is unlawful, oppressive, fraudulent, or unfairly prejudicial to the petitioner;

. . . .

S.C.Code Ann. § 33–44–801(4) (Supp.2004). In winding up the business of the limited liability company, the assets of the company must be applied to "discharge its obligations to creditors, including members who are creditors," with the surplus being paid to members in accordance with their right to distribution. S.C.Code Ann. § 33–44–806(a) (Supp.2004).

■ Members of limited liability companies may enter into an operating agreement that outlines the procedures governing the affairs of the company. S.C.Code Ann. § 33–44–103 (Supp.2004). Operating agreements are binding contracts that are superior to statutory authority where they are in place. However, to the extent that the operating agreement is silent as to some matter, statutory law will apply. *Id.* Thus, courts deciding a controversy between members must first evaluate a limited liability company's operating agreement regarding a particular procedure prior to supplementing any areas not covered by the agreement with statutory law.

The sections of Dixie Holdings' operating agreement pertinent to this discussion concern Mallon's claim for reimburse-

ment and the need for an accounting. Section 6.4 of Dixie Holdings' operating agreement provided that the company "shall reimburse Members for all authorized, direct out-of-pocket expenses incurred on behalf of the Company." In addition, the operating agreement contained the following provisions:

Section 12.4 *Priority of Distribution of Assets.* In the event of a Termination Event and the Members do not elect to continue the business of the Company, the assets of the Company shall be distributed in the following order and priority:

(a) To the payment of debts and liabilities of the Company (other than the Capital Contributions of the Members) and expenses of liquidation;

(b) To the setting up any reserves ...; and

(c) To each Member in accordance with their respective Membership Percentages.

. . . .

Section 12.6 *Final Accounting.* Each of the Members shall be furnished with a statement setting forth the assets and liabilities of the Company as of the date of the complete liquidation. Upon compliance by the Company with the foregoing distribution plan, the Members shall cease to be such, and they shall execute and cause to be filed any and all documents necessary with respect to termination and cancellation.

Relying upon sections 33–44–410 and 33–44–801 of the South Carolina Code, the master noted that he had discretion to fashion a remedy short of an accounting. The master concluded that Mallon, Dixie Holdings, and Dixie Developers failed to timely request an accounting and thus waived any right to have one. Therefore, the master determined that awarding HCH 50% of the original proceeds from the sale of 15 Felix Street and dissolving Dixie Holdings was the appropriate remedy. Although we recognize the master may grant relief to a member pursuant to section 33–44–410 without an accounting of the limited liability company's business and the master has authority to order dissolution of a limited liability company pursuant to section 33–44–801, we find under these

circumstances an accounting was necessary for the dissolution and winding up of Dixie Holdings' business.

Dixie Holdings' operating agreement required an accounting prior to dissolution. In order for the master to determine what amounts are to be distributed to the members pursuant to section 12.4 of the operating agreement, he was first required to determine what assets Dixie Holdings owned at the time of dissolution. Those assets cannot be determined until the debts and liabilities of the company are paid. Thus, the master must first conduct an accounting to determine the balance of Dixie Holdings' assets after the payment of liabilities, which presumably under the operating agreement includes reimbursements to members. In addition, section 12.6 of the operating agreement contemplates a final accounting upon complete liquidation. Although Coker gave Mallon a box containing some of the company's financial records in 2000, that act did not amount to a formal accounting necessary for the dissolution of the company. Because the operating agreement required an accounting, the master erred in ignoring this document.

Further, even assuming the operating agreement was silent as to some aspect of winding up Dixie Holdings, we find an accounting was warranted pursuant to statute. Section 33–44–410 provides that a member can sue the limited liability company or another member to enforce rights under the operating agreement and relief may include an accounting. S.C.Code Ann. § 33–44–410 (Supp.2004). In winding up the business of a limited liability company, courts are required to determine the assets, discharge obligations to creditors, and distribute the surplus to members. S.C.Code Ann. § 33–44–806(a) (Supp.2004). In most instances, including the present case, this task can only be accomplished after an accounting. Accordingly, the master erred in ordering the dissolution and ultimately the distribution of Dixie Holdings' assets without first requiring an accounting.

In addition to finding an accounting necessary under these circumstances, we find Mallon did not waive his right to an accounting.

A waiver is a voluntary and intentional abandonment or relinquishment of a known right. Generally, the party

claiming waiver must show that the party against whom waiver is asserted possessed, at the time, actual or constructive knowledge of his rights or of all the material facts upon which they depended.

*Janasik v. Fairway Oaks Villas Horizontal Prop. Regime,* 307 S.C. 339, 344, 415 S.E.2d 384, 387–88 (1992).

HCH pled its right to an accounting in its complaint, to which Mallon assented in his answer.[8] In response to HCH's motion for a directed verdict, Mallon argued that an accounting should be performed. The record is void of any evidence of Mallon's voluntary and intentional abandonment of his right to an accounting. Thus, the master erred in finding Mallon waived his right to an accounting and in not conducting an accounting pursuant to the dissolution and winding up of Dixie Holdings' business.

Finally, HCH argues that no accounting was necessary because there were no debts after the master determined that Mallon had waived his right to setoff charges and the only asset to be distributed was the disputed $41,845.30. This argument overlooks the fact that the parties were required by the operating agreement to have an accounting of all of Dixie Holdings' business prior to dissolution. The master's findings that Mallon was not entitled to setoff and the fact that Dixie Holdings' only remaining asset was the disputed amount will only serve to make this task easier.

■ Accordingly, we reverse the master's decision to deny the parties an accounting and remand this matter for a formal accounting of Dixie Holdings. Our decision to remand this matter for an accounting affects other aspects of the master's

---

8. Mallon's letter to the clerk of court, treated as his initial answer by the master, stated that there was a need for a full accounting and he desired arbitration. In his formal answer later filed after obtaining counsel, Mallon initially states that he believes an accounting is appropriate for both parties. Later in the formal answer, he alleges that HCH should be estopped from requesting an accounting from Mallon, Dixie Holdings, and Dixie Developers because Coker's failure to maintain financial records rendered an accounting from them impossible. Although HCH argues that the latter statement amounted to a wavier of the request for an accounting, we interpret it as merely an expression that Coker's mismanagement of financial records frustrated the parties' ability to conduct an accounting. Thus, these sections can be consistently read together to indicate that Mallon still desired an accounting.

award to HCH. Because the proceeds from the sale of 15 Felix Street are the property of Dixie Holdings until a final accounting is performed, we must also reverse the master's decision to award one-half of the proceeds to HCH. Further, because we reverse the award to HCH, we must likewise reverse the associated award of prejudgment interest. The proceeds from the sale of 15 Felix Street shall be held in an escrow account for the benefit of Dixie Holdings until a final accounting is performed and the appropriate amounts distributed accordingly.[9]

## II. Attorney's Fees and Costs

Mallon argues the master erred in awarding attorney's fees and costs to HCH. Mallon contends because HCH asserted its own rights and not those of Dixie Holdings, HCH's action is not a derivative action. Mallon also argues the attorney fee affidavit provided by counsel for HCH was not sufficient. In addition, Mallon contends the master erred in not making specific findings required to award attorney's fees. Finally, Mallon argues Coker created the necessity for the action because he failed to provide a proper accounting.

We find most of Mallon's arguments not preserved for our review. In order for an issue to be preserved for appellate review, with few exceptions, it must be raised to and ruled upon by the trial judge. *Lucas v. Rawl Family Ltd.*

---

9. Mallon raises several other issues on appeal, including whether the circuit court erred in: (1) disallowing Mallon's charges for the Felix Street properties; (2) disallowing the charges involved with the Dixie Developers properties; (3) finding the relief granted was justified by Mallon's attempt to dissociate from Dixie Holdings; (4) excluding evidence of Coker's self-dealing and misappropriation of Dixie Holdings' funds; and (5) awarding attorney's fees and costs. The arguments in support of these issues, for the most part, either were not raised below or were presented in Mallon's brief in a conclusory manner without supporting authority. *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (holding that issues not raised to or ruled upon by the trial court my not be considered on appeal); *Fields v. Melrose Ltd. P'ship*, 312 S.C. 102, 106, 439 S.E.2d 283, 285 (Ct.App.1993) (holding that failure to provide argument or supporting authority for an issue renders it abandoned). Thus, these issues each have procedural problems that foreclose appellate review and we decline to address them. However, we address the attorney's fees issue to the extent it may be viewed as preserved.

*P'ship*, 359 S.C. 505, 511, 598 S.E.2d 712, 715 (2004). When a trial court fails to address the specific argument raised by the appellant, the appellant must make a motion to alter or amend pursuant to Rule 59(e), SCRCP, to obtain a ruling on the argument. In the absence of such a motion, the matter is not preserved and the appellate court cannot consider the argument on appeal. *Noisette v. Ismail,* 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991). In addition, when raising an issue through an objection, the "objection must be sufficiently specific to inform the trial court of the point being urged by the objector." *Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998).

▮ HCH asserted in its complaint its entitlement to attorney's fees and costs pursuant to section 33–44–1104 of the South Carolina Code. This section provides:

If a derivative action for a limited liability company is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to the limited liability company the remainder of the proceeds received.

S.C.Code Ann. 33–44–1104 (Supp.2004). At trial, counsel for HCH submitted an attorney fee affidavit into evidence arguing HCH's entitlement to these fees pursuant to section 33–44–1104. Mallon's counsel responded with the following: "I do not concede, the Defendant does not concede that his client is entitled to attorney's fees in this case. I don't take issue with the number of hours that he proposed, or the usual things, the amount of the hours he worked, attorney time, assistant time...." However, Mallon's counsel did not further specify the reason for his objection, other than the following statement: "Mr. Coker's hand is so heavy in causing this problem to come about, that being equitable, you would find that my client, according to the facts in the record, that each party pays their own attorney's fees."

▮ Therefore, we find Mallon's argument that HCH's action did not meet the requirements for a derivative action not preserved for our review. Additionally, Mallon's counsel

specifically conceded to the sufficiency of the attorney fee affidavit and, therefore, cannot take issue with it on appeal. *See TNS Mills, Inc. v. South Carolina Dep't of Revenue,* 331 S.C. 611, 617, 503 S.E.2d 471, 474 (1998) ("An issue conceded in a lower court may not be argued on appeal.").

In regard to Mallon's assertion that the master did not make sufficient findings with regard to his award of attorney's fees, we find this argument not preserved for our review and, in addition, it is without merit.

▬▬▬ When a trial court makes a general ruling on an issue, but does not address the specific argument raised by the appellant and the appellant does not make a motion to alter or amend pursuant to Rule 59(e), SCRCP, to obtain a ruling on the argument, the appellate court cannot consider the argument on appeal. *Noisette,* 304 S.C. at 58, 403 S.E.2d at 124.

The master, in his order, stated: "based upon the record, the Affidavit of Counsel, and the factors applying to an award of fees and costs, that the Plaintiff is entitled to an award and that the total amount, $15,643[.]60, is reasonable." Mallon, however, did not file a Rule 59(e), SCRCP motion to alter or amend the master's order. Rather, Mallon argues the insufficiency of the master's findings for the first time on appeal. Therefore, we find this argument not preserved for our review.

Finally, Mallon alleges Coker failed to turn over the books and records, which he claims precipitated this litigation. Thus, he argues it was inequitable for the master to award HCH attorney's fees. We disagree.

▬▬▬ An award of attorney's fees is within the discretion of the trial court and will not be overturned absent an abuse of that discretion. *Wooten v. Wooten,* 358 S.C. 54, 65, 594 S.E.2d 854, 860 (Ct.App.2003). Although Mallon points to Coker's failure to provide adequate company records as the catalyst to the underlying lawsuit, it is undisputed that HCH filed the lawsuit after repeated requests for Mallon to place Dixie Holding's funds from the sale of 15 Felix Street into a proper escrow account. The master found Mallon's actions necessitated the lawsuit and awarded HCH attorney's fees. We find

the master did not abuse his discretion in awarding HCH attorney's fees.

## CONCLUSION

We find Mallon's arguments supporting his contention that he is entitled to reimbursement for expenses paid on behalf of Dixie Holdings and Dixie Developers are either not preserved for our review or are without merit. Therefore, we affirm the master's order concerning these expenses. In addition, we find the master erred in not conducting an accounting pursuant to dissolving and winding up the business of Dixie Holdings. We order the proceeds from the sale of 15 Felix Street to be placed in an escrow account for the benefit of Dixie Holdings. Because we find the master erred in not conducting an accounting, he further erred in making a final distribution to HCH from the proceeds of the sale of 15 Felix Street. Additionally, because we find the award to HCH in error, we find no award upon which to grant HCH prejudgment interest. Finally, we find no error by the master in awarding HCH attorney's fees. Accordingly, the master's order is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

ANDERSON and SHORT, JJ., concur.