## Axton v. Kentucky Bottlers Supply Company, et al.

## Kentucky Bottlers Supply Company, et al. v. Axton.

(Decided May 15, 1914.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Partnership—Dissolution as Termination of Contract of Partnership.—Where both partners are liable on a contract, the dissolution of the firm will not terminate the contract.

2. Partnership—Relations of Partners—Duty to Act with Good Faith.—The duty of a partner to act with good faith is not confined to persons who are actually partners, but extends to persons negotiating for a partnership, and to persons who have dissolved partnership and have not completely wound up and settled the partnership affairs.

3. Partnership—Dissolution—Unauthorized Cancellation of Contracts by Withdrawing Partner—Liability in Damages.—Where a partner about to withdraw from a firm, and before the date fixed for dissolution, canceled, in the name of the firm and without the knowledge of his co-partners, certain valuable supply contracts held by the firm, and arranged individually to represent the supply houses as agent, thus depriving the remaining members of the firm, by reason of their inability to secure supplies, of an opportunity to realize their usual profits during the season; held, that the withdrawing partner was liable for dam-

ages by way of loss of profits occasioned by the cancellation of the contracts.

BURTON VANCE, W. L. DOOLAN and GEO. W. JOLLY for appellant and appellee Axton.

THUM & ROY for appellee and appellant Kentucky Bottlers Supply Company.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming on Each Appeal.

Plaintiffs, W. D. Roy and L. D. Roy, individually, and as partners doing business under the firm name of Kentucky Bottlers Supply Company, brought this action against defendant, I. T. Axton, to recover damages for breach of contract of dissolution of a co-partnership existing between plaintiffs and defendants. They recovered a judgment against defendant for $2,420. Defendant appeals, and plaintiffs prosecute a cross appeal.

In the year 1909, plaintiffs, W. D. Roy and L. D. Roy, father and son, entered into a partnership with defendant, I. T. Axton, under the firm name of Kentucky Bottlers Supply Company. Under this name they engaged in the business of selling bottles and boxes at wholesale, and also acted as selling agents for manufacturers of such ware. At the time the partnership was entered into, W. D. Roy was in the wholesale whiskey business, and prior thereto had held a responsible position with one of the largest distilleries in Louisville. His purpose was to establish a business for his son, L. D. Roy. Axton had been engaged in the business of selling bottles and boxes as traveling salesman. In carrying on the firm business W. D. Roy looked after the sales, while Axton purchased the supplies required by the firm. The business prospered from the very first. Early in the year 1911, some friction arose between the Roys and Axton, and as early as March of that year the question of the withdrawal of W. D. Roy or of Axton from the firm was discussed. On April 18, 1911, the following contract of dissolution was entered into by the parties:

"Whereas the undersigned have agreed that the partnership heretofore existing among them shall be dissolved at the close of business April 30, 1911, it is now further stipulated and agreed that I. T. Axton shall retire and turn over to W. D. Roy and L. D. Roy, or to whomever they may elect, all books, papers and other

effects belonging to the firm of Roy & Axton, and in consideration therefor the said W. D. Roy and L. D. Roy shall on May 1 next pay to said I. T. Axton the sum of $5,000, and also execute to him notes at thirty and sixty days to cover any balance that may be due him as may be shown when the books of Roy & Axton are closed for the month of April. Said notes shall be dated May 1 and bear interest at the rate of 6 per cent per annum. Said W. D. Roy and L. D. Roy reserve the option of paying either or both of the notes before maturity.

"It is agreed that nothing above is to keep I. T. Axton from securing interest in any business or contracts Roy & Axton may now have.

"W. D. Roy and L. D. Roy also agree to hold I. T. Axton harmless from liability under the lease from W. W. Heaton to Roy & Axton."

The Roys paid to Axton the $5,000 mentioned in the contract, and also executed and delivered to him two notes, aggregating $1,659.13.

According to the evidence for plaintiffs the firm had three contracts; one with the Olney Bottle Company, another with the Sheffield Glass Bottle Company, and a third with the Buckeye Box Company, to furnish supplies during the summer of 1911. On or about the 22nd of March, 1911, Axton went east on a trip. While there he arranged with several manufacturers to represent them in the event of the dissolution of the partnership. A portion of his expenses was charged to the firm. The Roys knew nothing of this action on his part until some time later. It further appears that on April 26th Axton wrote, in the name of the firm, to the manufacturers with whom the firm had contracts, and canceled the contracts. At the same time he wrote them letters in his individual name requesting his appointment as their sole agent in the Louisville territory, beginning with May 1st. In the letters of cancellation he requested the manufacturers not to acknowledge receipt until after May 1st. After receipt of the letters the manufacturers took on other orders, and were unable to supply the Roys with any bottles or other ware during the summer. The Roys attempted to get bottles, but were unable to do so. On this account they were unable to fill their orders, or to solicit any new business for the summer of 1911. W. D. Roy fixes their damage at $1,000 a month, while L. D. Roy fixes it at $800 a month. From May 1 to October 1, 1911, the business showed a profit of only $580. During the

preceding summer it appears, without contradiction, that the sales aggregated $37,827.69, or an average of $7,565.50 a month, and that the profit on these sales amounted to 10 per cent. It is further shown that the contract of dissolution was drawn by W. D. Roy. Axton wanted to insert in the contract the words "except contracts." To this the Roys would not agree. After some discussion, Axton wrote on a slip of paper the following: "It is agreed that nothing above is to keep I. T. Axton from securing interest in any business or contracts Roy & Axton may now have." The paper was handed to W. D. Roy, who finally consented that it might be incorporated in the agreement.

According to the testimony for Axton, the assets of the firm consisted of a lot of supplies and book accounts due the firm for goods sold to customers. These assets were valued at $16,647.83. Axton's part, which was 40 per cent, was estimated to be worth $6,659.13. This was the sum received by him. It was understood between the parties that each of the partners would thereafter continue in the same business. No consideration was paid to him for the contracts. Contracts were to be terminated when the partnership terminated. After that time either of the partners had the right to go after these contracts. The reason he notified the manufacturers to cancel the contracts was because the Roys declined to give him a contract indemnifying him against loss on the contracts, and because W. D. Roy was contending that he would have to go to the Roys for his supplies. It is further shown that the bottle contracts required that specifications for ware for summer requirements should be furnished not later than May 1, 1911, and that none were ever furnished the parties with whom the firm had contracts. It is also shown that the Olney Bottle Company broke down on May 18th, and after that it was unable to furnish either Axton or the Roys any bottles. The firm had no contract with the Wilcox Bottle Company, which simply supplied the Sheffield Glass Bottle Company its orders for a portion of the Roy & Axton ware. It sent W. D. Roy ten cars, but after May 10th was unable to furnish others. Some of the parties to whom the Roys applied for supplies during the summer of 1911 were not engaged in the business of furnishing bottles, but were making other kinds of wares. It was not his duty to furnish specifications for supplies until furnished with orders therefor by W. D.

Roy. Axton also claims that he offered to supply the Roys with bottles, but they declined his proposition.

In rebuttal the Roys testified that the provisions of the contract with reference to furnishing specifications for wares prior to May 1st were never enforced by the supply houses, but were always waived. Though Axton did offer to supply them with bottles, he wanted a portion of the profits, and on this account, and in view of his previous conduct, they declined the proposition.

Counsel for Axton argue with great earnestness that the contracts for supplies were not considered in valuing the assets of the partnership, and were not included in the invoice. That so far as all parties were concerned, the contracts were terminated when the partnership ended. That the factories were then free to renew them with either of the parties, and that Axton reserved the right to get the contracts. Having this right, it was immaterial whether he exercised it before or after May 1st. It is not true, of course, that the contracts for supplies ended with the dissolution of the firm. Campbellsville Lumber Co. v. Bradlee & Wiggins, 96 Ky., 494; Peck-Williamson Heating & Ventilating Co. v. Miller & Harris, 118 S. W., 376. They were still binding on the firm, and could have been enforced by the supply houses. It is very evident from the contract of dissolution that the purpose thereof was to effect a sale to the Roys of Axton's interest in the firm. This interest was arrived at by an invoice of the supplies on hand and the accounts due the firm. Even if it was not intended for Axton to convey his interest in the contracts in question, yet the Roys themselves had a 60 per cent interest, and he only a 40 per cent interest. Construing the provision of the contract with reference to Axton's "securing interest in any business or contracts Roy & Axton may now have" in a manner most favorable to Axton, it is manifest that it gave only the right to secure such interest in a lawful way. It did not give him a right while a member of the firm to cancel the contracts in the name of the firm, and thereby destroy the business of his partners. Even upon his theory that the parties were to be free after May 1st to secure interest in the contracts in question, his conduct while a member of the firm deprived the Roys of every opportunity to avail themselves of such freedom. It is the duty of each partner to act with the utmost good faith towards his co-partners. Each is the confidential agent of the other, and each has a right to know all that

the others know.  A person will not be permitted to benefit himself at the expense of the firm.  The obligation of good faith is not even confined to persons who are actually partners.  It extends to persons negotiating for a partnership, and to persons who have dissolved partnership and have not completely wound up and settled the partnership affairs.  Collier on Partnership, page 166; Lindley on Partnership, Vol. 2, page 772; 30 Cyc, 438, 659 and 660; 22 Am. & Eng. Ency. of Law, page 114.  In the present case Axton, while a member of the firm, deprived his co-partners of valuable contract rights which they would have enjoyed had it not been for his conduct. Even if his relations with the Roys were unfriendly and he felt like doing them an injury, he cannot expect that such conduct will receive the sanction and approval of the courts.  In his preparation to secure the contracts he took no chances.  While a member of the firm he arranged for his appointment as agent of the supply houses in the event of the firm's dissolution.  He then agreed to a ssociation, and sold out his interest in the firm.  In his letters canceling the contracts with the supply houses, he was careful to advise them not to notify the firm of the cancellation until after May 1st, thus giving the members of the firm no opportunity to act until the cancellations became effective.  He knew the value of the contracts.  He also knew that it would be practically impossible for the Roys to obtain other supplies, and without such supplies they would be deprived of an opportunity to realize their usual profits during the season of 1911.  Under these circumstances, he is clearly liable for damages by way of loss of profits occasioned by the cancellation of the contracts.

We deem it unnecessary to set out in detail the evidence in regard to losses which the Roys actually sustained.  The previous year the firm had made on an average about $750 a month.  The success of its business depended on its ability to get supplies.  We think it clear that they used reasonable diligence to secure supplies from other sources.  Axton himself admits that the supply contracts were valuable, and the manner in which he endeavored to secure them for himself certainly confirms his testimony.  During the season in question the profits of the business were but a few hundred dollars. It is by no means probable that this great falling off was due entirely to Axton's withdrawal from the firm.  It was due, we think, in a large measure to the cancellation

of the contracts, and the fact that the supply houses then took on other contracts, and were unable to supply the Roys with the ware which they needed. Axton contends that the Roys were not damaged. The Roys claim that the chancellor fixed the damages too low. After a careful consideration of the evidence, we conclude that the judgment does substantial justice between the parties.

The judgment on each appeal is affirmed.