Shirley McVay LACH Individually and on Behalf of Man O'War Limited Partnership, a Kentucky Limited Partnership, Appellant,

v.

MAN O'WAR, LLC, Formerly Man of War Management, LLC (A Kentucky Limited Liability Company), et al, Appellees.

No. 2005–SC–001014–DG.

Supreme Court of Kentucky.

March 20, 2008.

As Corrected March 31, 2008.

Rehearing Denied June 19, 2008.

Glen S. Bagby, J. Robert Lyons, Jr., Woodward Hobson & Fulton LLP, Lexington, KY, Elizabeth U. Mendel, Woodward Hobson & Fulton LLP, Louisville, KY, Counsel for Appellants.

Phillip D. Scott, Theodore R. Martin, Greenebaum, Doll & McDonald, PLLC, Lexington, KY, Counsel for Appellees.

Robert S. Ryan, Fowler, Measle & Bell, PLLC, Lexington, KY, Counsel for Appellee, Stefanie Wiseman, Executrix of the Estate of Isaac Lynwood Wiseman, Deceased.

Carroll M. Redford III, Miller, Griffin & Marks, PSC, Lexington, KY, Counsel for Appellee, Penny M. Miller, Executrix of the Will of Robert S. Miller, Deceased.

Opinion of the Court by Justice SCOTT.

We granted discretionary review of an opinion of the Court of Appeals affirming the Fayette Circuit Court's grant of summary judgment against the Appellant, Shirley Lach (Lach). We now reverse and remand the matter to the trial court for further proceedings consistent with this opinion.

**Facts**

In 1986, Lach and her then husband, Lynwood Wiseman (Wiseman),[1] entered into a joint venture with other individuals to acquire a piece of real estate for development in Lexington, Kentucky. They also formed Man O' War Limited Partnership (the Partnership) for the purpose of leasing real property, as well as the development and operation of shopping centers. Robert S. Miller (Miller), an attorney, provided assistance and became a participant. Miller and Wiseman became the general partners in the Partnership, while Lach was one of several limited partners. They also formed M.O.W. Place, Ltd., (LTD) to lease the shopping center from the joint venture. LTD was controlled and managed through the Partnership as LTD's sole general partner until the occurrence of events in 2002 which are the subject matter of this litigation.

At all times, the Partnership's general partners, and their ownership percentages were essentially, Miller (1.01802%) and Wiseman (32.43243%). The limited partners and their ownership percentages were essentially, Lach (27.02703%), Jonathan Miller (8.5%), Harry B. Miller (11.71171%), Harvey Morgan (1.08108%), Penny Miller (3.24324%), Jeffery Mullens (1.08108%), Jennifer Miller (8.5%), and Sophie Wiseman (5.40541%).

In 2002, the Partnership discovered that one of Wiseman's non-partnership employees had over a period of years, stolen in excess of $200,000.00 from the Partnership. Lach had made several inquiries and complaints to the general partners regarding this possibility due to inconsistent entrees in its books and records. As a result, Wiseman paid the money back to the Partnership and a professional management company was retained to actively manage the Partnership and shopping center.

Later in the spring of 2002, Miller discovered he was gravely ill with cancer. With his approaching death, he contacted Lach in April 2002, and asked for a meeting concerning the shopping center. At the meeting, Miller asked Lach to sign a document he had prepared, which would name Wiseman, Jeffery Mullens, (brother-in-law of Robert Miller), and Jonathan Miller (son of Robert Miller), as the new general partners of the Partnership. Under the Partnership agreement, new general partners could not be added without the consent of all the partners. The document further provided that when Wiseman

---

1. Lach and Wiseman divorced in 1988, soon after the endeavor began.

died, "the two remaining general partners will select a new general partner." Lach objected as the proposal would permit the Miller family, which owned less than Lach's individual interest, to manage and control the shopping center. The Millers' would have two of the three general partners while Wiseman, who was then of advancing age, was alive. Upon his death, Jonathan Miller and Jeffery Mullens would then select the third general partner.

Believing it would be best if one of the three general partners controlling the shopping center was a person outside the Miller family, Lach responded with a proposal substituting her daughter, Sherri McVay, an attorney, as a general partner in lieu of Jeffery Mullens. Her proposal was rejected.

Miller and Wiseman then sought counsel in an effort to restructure the business form of the partnership so as to eliminate the necessity of acquiring Lach's consent to the proposed management change. Upon advice of counsel, they formed a new business entity, Man O' War Limited Liability Company (the LLC). When operational, the LLC would be operated under the "manager form," controlled only by *a majority vote* of the owners. The initial managers were to be Wiseman, Jonathan Miller, and Jeffery Mullens.

Once this was done, they transferred the Partnership's interest as the sole general partner in LTD to the LLC, while the ownership of the LLC was transferred to the Partnership in return. After the transfer, Miller and Wiseman dissolved the Partnership, distributing its assets (the ownership of the LLC) to the partners in identical proportions to their previous ownership of the Partnership, that is— with one catch. Unless a partner signed the documents presented, which would necessarily validate the restructuring, that partner would have *no voting rights in the LLC.* As all the other partners signed the

agreement, Lach was the only one left without any voting rights. Income, yes— any say in the management, no.

The fact that the Partnership's restructuring was to avoid the required consent of Lach to the proposed changes in management is amply demonstrated. For example, billing on April 19, 2002, from counsel retained for the Partnership by Wiseman and Miller, was for "[a]ttention to freeze out and letter to Sam Brown on requirements." Billing on April 22, 2002, was for "[c]onference regarding change of limited partnership to limited liability company." Billing on April 23, 2002, was for "[c]onference regarding non[-]execution of Operating Agreement by dissident limited partner." Counsel's letter of April 24, 2002, to the Partnership accountant, acknowledged, "[a]s we discussed earlier this week, we have been asked to consider a restructuring of [the Partnership] with the goal of eliminating the ability of any one limited partner ... to prevent any action of the [Partnership]. . . . "

Lach then brought this action in the Fayette Circuit Court alleging, among others, that (1) the restructuring (or conversion) of the business form of the Partnership without her consent was invalid, (2) the transfer of the assets of the Partnership to the LLC and the Partnership's subsequent termination was a violation of KRS 362.490 and a breach by the general partners of their fiduciary duty to the Partnership and Lach. The trial court denied Appellant's motions for partial summary judgment and granted summary judgment thereon, in favor of the Appellees. The trial court also denied her motion to compel the production of all communications between the Partnership, general partners and counsel regarding the reasons for the restructuring of the Partnership business. The Court of Appeals affirmed the trial court's summary

judgments, and as a consequence, found the discovery issues to be moot.

### I. The standard of review

The standard of review for summary judgments is whether the trial court correctly determined that there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky.1991). Where there are no material disputes of fact, the question is one of law and "may be reviewed *de novo.*" *Bob Hook Chevrolet Isuzu, Inc. v. Com. Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998).

### II. The restructuring of the partnership business

Appellant argues that the restructuring of the Partnership business form was invalid without her consent for two reasons: (1) the restructuring was a conversion in violation of KRS 275.370, and (2) the restructuring made it impossible for the Partnership to carry on its business in violation of KRS 362.490. The Appellees on the other hand, argue that (1) the restructuring of the Partnership business into that of the LLC did not constitute a "conversion" subject to the mandates of KRS 275.370 and (2) the Partnership agreements gave the general partners authority to restructure as they did. Moreover, the restructuring did not make it impossible to carry on the Partnership's ordinary business; rather, it made it possible to continue the business, given Lach's objection to the proposed new general partners.

#### a. Conversions under KRS 275.370

KRS 275.370 provides, in pertinent part:
> (1) A partnership or limited partnership may be converted to a limited liability company pursuant to this section.

> (2) The terms and conditions of a conversion of a partnership or limited partnership to a limited liability company shall, in the case of a partnership, be approved by all the partners or by a number or percentage specified for conversion in the partnership agreement or, in the case of a limited partnership, by all the partners, notwithstanding any provision to the contrary in the limited partnership agreement.

While conceding that the statute, in this instance, requires the approval of all the limited partners before a limited partnership can be converted into a limited liability company, the Appellees argue that the transformation constituted a "reorganization," not a "conversion" as envisioned under KRS 275.370(1). Thus, KRS 275.370(2), requiring the consent of all the limited partners, was not applicable. The Appellees illustrate their distinction of the word "conversion," by pointing out that the statute envisions a limited partnership *redesignating itself* as a limited liability company, whereas, in this instance, the limited liability company was created separately and existed concurrently with the Partnership (albeit without any assets). Thus, the fact that the LLC acquired all the assets of the Partnership and the Partnership then dissolved is simply immaterial.

Appellant on the other hand, points to Mr. Miller's statement in his deposition, "that there was a conversion from the partnership to an LLC," and to the statement of their counsel, who in his letter of June 11, 2002, responding to an inquiry by Appellant's counsel, acknowledged, "the general partners determined that a conversion to a Limited Liability Company (LLC) was in the best interest of the partnership. The reconstructing has been accomplished." We must, however, analyze a transaction for what it is, not what someone says it is.

■ In resolving the dispute, we must follow common rules of statutory construction. Thus, "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature ...." KRS 446.080(1). Moreover, "[a]ll words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." KRS 446.080(4).

> It is a well-known rule for the interpretation of statutes that the court should ascertain from their terms, as contained in the entire enactment, the intent and purpose of the Legislature, and to administer that intent and purpose. Furthermore ... words will be given their ordinary and usually understood meaning, unless a different or technical meaning, as gathered from the entire contents, was intended.

*Seaboard Oil Co. v. Commonwealth*, 193 Ky. 629, 237 S.W. 48, 49 (1922).

■ Moreover,

> [i]f a thing contained in a subsequent statute be within the reason of a former statute it shall be taken to be within meaning of that statute, and, if it can be gathered from a subsequent statute in *pari materia* what meaning the Legislature attached to words of a former statute, this will amount to a legislative declaration of its meaning and will govern construction of first statute.

*Miller v. Kirksey*, 265 Ky. 106, 95 S.W.2d 1059, 1061 (1936).

KRS 275.375(1) acknowledges that "[a] partnership or limited partnership that has been converted pursuant to this chapter shall be for all purposes the same entity that existed before the conversion." KRS 275.375(2) recognizes that the property "*shall remain* vested in the converted [business entity] ... [and][a]ll obligations of the converting ... limited partnership *shall continue* as obligations of the converted [business entity]." (Emphasis added) All of which seem to confirm Appellant's argument that a "conversion" involves only one entity changing its legal form pursuant to statutory authorizations, rather than through interaction between *two* entities.

Looking at subsequent statutes for what light they cast on the question, we note that the Kentucky Legislature adopted the *new* Kentucky Uniform Limited Partnership Act in 2006. KRS 362.2–102, et. seq. This Act was adopted, with some changes, from the Uniform Limited Partnership Act (2001). Unif. Limited Partnership Act § 1102–1105, 6A U.L.A. 106–109 (2006). The Act specifically provides "[i]n applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." KRS 362.2–1201.

■ When the need for uniformity is acknowledged, courts may consider the "Official Comments" to a Uniform Act, even where they have not been officially adopted. *Cf., White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56, 60 (Ky.App. 1979). Looking at the Official Comments to § 1102 of the Uniform Limited Partnership Act, which, with changes, corresponds to KRS 362.2–1102, the Comment acknowledges, "[i]n contrast to a merger, which involves at least two entities, a conversion involves only one. The converting and converted organizations are the same entity." Unif. Limited Partnership Act § 1102–1105, GA U.L.A. 107 (2006).

■ Having thus considered the statutory scheme, its particular language, the subsequent statute and Official Comments, we answer the question that was presented to us—that the restructuring of the busi-

ness form of the Partnership, to that of the LLC, in this instance, was not a conversion under, or subject to, KRS 275.370, for reasons that a conversion deals only with one entity. We have not been asked, nor have we considered, whether the restructuring of the Partnership into the LLC constituted a merger, pursuant to KRS 362.531.

### b. Breach of partners' fiduciary duty

 Under Kentucky law, partners owe the utmost good faith to each and every other partner. *See Axton v. Kentucky Bottlers Supply Co.*, 159 Ky. 51, 166 S.W. 776, 778 (1914). "The scope of the fiduciary duty has been variously defined as one requiring utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing." *Anthony v. Padmar, Inc.*, 320 S.C. 436, 465 S.E.2d 745, 752 (App.1995). Indeed, it has often been said, "there is no relation of trust or confidence known to law that requires of the parties a higher degree of good faith than that of a partnership." *Van Hooser v. Keenon*, 271 S.W.2d 270, 273 (Ky.1954). Thus, "the doing of an act proscribed by [law] is a breach of that duty." *Gundelach v. Gollehon*, 42 Colo.App. 437, 598 P.2d 521, 523 (1979) (internal citations omitted).

*Gundelach* involved a sale of all a limited partnership's assets under a statutory scheme and circumstances similar to the case at hand. The Colorado statute therein interpreted provided, in pertinent part:

> (W)ithout the written consent or ratification of the specific act by All the limited partners, a general partner or all of the general partners have no authority to:
>
> (b) Do any act which would make it impossible to carry on the ordinary business of the partnership.

*Id.* at 523.

Finding that all of the limited partners did not approve of the transfer of the limited partnership's assets and noting the dissolution of the limited partnership after the transfer, the Court in *Gundelach* concluded, "that upon transfer of the sole asset of the limited partnership, it was no longer possible for the partnership to carry on its ordinary business within the meaning of [the statute]." *Id.*

*Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1074–1075 (2nd Cir.1977), also involved circumstances similar to the case at hand. Therein, the general partners and most of the limited partners desired to change the business from a limited partnership to that of a corporation. Over the objection of three of the limited partners, they transferred all the limited partnership's property to the corporation and resumed the partnership's business within the corporate structure. Both the Federal District Court for the Southern District of New York and the Second Circuit Court of Appeals held that, "the transfer of the Partnership assets without the consent of [the dissenting limited partners] was a violation of section 98 of New York Partnership Law." *Id.* at 1074. Section 98(1)(b) provides that general partners may not, without the consent of all the limited partners, do any act which would make it impossible to carry on the ordinary business of the partnership. *Id.* at 1067. The court further noted, "[t]he February 11 transfer effectively terminated the Partnership and tunneled its assets into a new entity. It is difficult to conceive of an act that would make it more 'impossible to carry on the ordinary business of the partnership.'" *Id.* at 1074.

KRS 362.490 provides, in pertinent part: A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act

by all the limited partners, a general partner or all the general partners have no authority to

* * *

(2) do any act which would make it impossible to carry on the ordinary business of the partnership.[2]

Our statute thus mirrors the Colorado and New York statutes analyzed in *Gundelach, supra,* and *Newburger, Loeb & Co., Inc., supra.*

The Appellees, however, argue that Miller and Wiseman had the authority to perform all the acts constituting the restructuring without Lach's consent because they did not make it impossible to carry on the business of the partnership. They assert, *it was the only act which made it possible* to carry on the business of the partnership; suggesting that Lach would, by virtue of her right of rejection, have destroyed the partnership's business, something she hadn't done for the previous sixteen years.[3] Moreover, the fact that a limited partner with significant ownership interests in a limited partnership would object to a transaction which would deprive her of her say in who might be able to successfully manage her business interest as a general partner, in return for a minority voting, or for that fact, a nonvoting interest, in a limited liability company controlled by a majority vote, is not evidence that such limited partner has an interest in destroying the business, including the value of her interest therein.

They further argue that under the certificate of partnership and partnership agreement, the general partners had the absolute right to "(1) terminate the partnership, (2) execute documents agreements, contracts, leases, etc., on behalf of the partnership, and (3) to manage the partnership business in all aspects, which should include, but should not be limited to ... take such other action, execute and deliver such other documents, and perform such other acts as the general partners may deem necessary, appropriate, or incidental to carrying out the business and affairs of the partnership." In this regard, they seek to distinguish *Gundelach, supra,* and *Newburger, Loeb & Co., Inc., supra,* through *Mist Properties, Inc. v. Fitzsimmons Realty Co.,* 228 N.Y.S.2d 406, 410 (Sup.Ct.1962), in which the court approved the general partner's transfer of title to property owned by the limited partnership as against the claim of the receiver, because the limited partnership agreement allowed the general partners to do so.

*Mist Properties, Inc., supra,* however, had a partnership agreement that gave the general partners the specific power to sell all of the partnership's property, subject to written approval of sixty-five percent of the limited partners. "There clearly appears to have been no violation of the statute since the conveyance was not without the written consent of the limited partners but was specifically contemplated and provided for by the agreement." *Id.* at 410. As the court recognized therein, the agreement the partners had made with themselves through their partnership agreement controlled. "There is no inter-

---

**2.** Pursuant to KRS 362.525, "[t]he repeal of any statutory provision by 1988 Acts Ch. 284, sec. 65, shall not impair, or otherwise affect, the organization or the continued existence of a limited partnership existing on July 15, 1988, nor does the repeal impair any contract or affect any right accrued before July 15, 1988." KRS 362.521(1) provides, "[a] limited partnership formed under any statute of this state prior to the adoption of [the Kentucky Revised Uniform Partnership Act of 1988] until or unless it becomes a limited partnership under [the Act of 1988] shall continue to be governed by the provisions of the statute under which it was formed."

**3.** The argument ignores the business fact that she was elected Chief of the National Home Builders Association in 1989, and was the owner of various other businesses.

vening public policy which prevents persons dealing at arm's length from entering into an agreement such as set forth above. It has been repeatedly held that where a limited partnership agreement has been entered into the partners cannot, inter se, set up that their rights are not governed thereby...." *Id.* at 410.

■■■ Simply put, we find that the general partners' rights under the partnership agreement to (1) terminate the partnership at any time upon agreement of the general partners, and (2) to act upon behalf of the Partnership in matters that are "necessary, appropriate, or incidental to carry out its business," can be not construed to allow them the power to transform the partnership into a limited liability company, in order to favor a majority of the partners in their selection, or substitution, of the general partners/managers of the business,[4] without the approval of all the limited partners.

"The obligations to do justice rest upon all persons, natural and artificial; if one obtains the money or property of others without authority, the law, independently of its expressed contract, will compel restitution or compensation." *Marshall's Adm'r v. Webster,* 287 Ky. 692, 155 S.W.2d 13, 18 (1941). "The law regards substance rather than form; the spirit and essence of a thing rather than the dry law. One may not do by indirection what he cannot do directly." *Id.* at 19. We therefore conclude that the transfer of the partnership assets to the LLC was in violation of KRS 362.490 and thus a breach of the general partners' fiduciary duty to the non-consenting limited partner.

Therefore, for the reasons as stated previously, the act of restructuring the business form from the Partnership to the LLC without the consent of all the limited partners was a breach of the general partners' fiduciary duty to the non-consenting limited partner. As the trial court has yet to determine the remedy, or remedies for such breaches, we will not address same. In so concluding, we are not unmindful of *Van Hooser v. Keenon,* 271 S.W.2d 270 (Ky.1954), *Axton v. Kentucky Bottlers Supply Co.,* 159 Ky. 51, 166 S.W. 776, 778 (1914), or *Anthony v. Padmar, Inc.,* 320 S.C. 436, 465 S.E.2d 745 (App.1995), cited to the contrary by Justice Abramson in her dissent, yet we note that the transfer here does not involve the rights of innocent third party purchasers as occurred in the cases cited.

### III. Discovery of communications between the partnerships, general partners and their counsel

As a consequence of its partial summary judgments, the trial court denied Appellant's discovery motions regarding the full communications between the partnership, general partners and their counsel in regards to the discussion, planning and implementation of the restructuring of the partnership into the LLC. Neither did the Court of Appeals consider the issue, having regarded it as moot, given its affirmance of the trial court's summary judgment rulings.

■■■ Although the trial court in its opinion gave no reason for denying the production, the arguments and record suggest the basis was attorney-client privilege. This "privilege is generally considered to be absolute as to communications made by or to a person advising with an attorney as to past transactions and offenses." *Steelvest,* 807 S.W.2d at 487. "However, the rule does not apply to future transactions when the person seeking

---

4. The agreements of the parties obscure the question of whether majority control of an LLC is more valuable than control of a limit-

ed partnership, subject to the approval of all the limited partners.

the advice is contemplating ... the perpetration of a fraud." *Id.* "We would presume to place the breach of fiduciary relationship on an equal par with fraud and deceit." *Id.* "Accordingly, we determine, as a matter of law, that a breach of a fiduciary duty is equivalent to fraud." *Id.*

▮ Thus upon remand, we hold that the attorney-client privilege cannot be used to prevent discovery of the requested information to the extent the information requested deals with, assists, or furthers the breach of a fiduciary duty by the general partners or the Partnership.

## IV. Conclusions

Having concluded as a matter of law that the restructuring of the limited partnership into a limited liability company without Lach's approval was a breach of the general partners' fiduciary duty to her, as was the transfer of the partnership's assets to the limited liability company in violation of KRS 362.490(2), and that the attorney-client privilege cannot be used to defeat discovery of evidence connected with the breach of a partner's fiduciary duty, we reverse the opinion of the Court of Appeals and remand this matter back to the Fayette Circuit Court with directions to grant partial summary judgment to the Appellant Lach, in regards to the general partners' breaches of fiduciary duty to her as well as the transfer in violation of KRS 342.490, and to make such additional decisions and findings, and to conduct such other proceedings, as are necessary and consistent with this opinion.

LAMBERT, C.J.; CUNNINGHAM and SCHRODER, JJ., concur.

ABRAMSON, J., dissents by separate opinion, with MINTON, J., joining that dissent.

NOBLE, J., not sitting.

Dissenting Opinion by Justice ABRAMSON.

I respectfully dissent. The majority correctly concludes that the restructuring at issue in this case was not prohibited by KRS 275.370, but then proceeds to upend Kentucky business law by declaring the general partners of a limited partnership breached a fiduciary duty to a limited partner by engaging in a transaction which was not only authorized by the partnership agreement but which advanced the interests of all partners in a manner that has caused the single complaining limited partner, Shirley Lach, no legal damage. The majority veers off course by stating, blithely, that (1) the Limited Partnership Agreement cannot mean what it actually says and (2) the transfer of partnership assets was in violation of KRS 362.490, a position unsupported by the cited case law from other states and, more importantly, a conclusion wholly at odds with the undisputed facts of this case. The circuit court and Court of Appeals dealt with this complex business matter appropriately, reaching the correct legal conclusions. We should do likewise by affirming.

### RELEVANT FACTS

In June, 1981 (not 1986), Shirley Lach and her then-husband, Lynwood Wiseman, entered into a joint venture known as Richmond Road/Man O' War Associates (the Joint Venture) with Linda Poole and trustees for various trusts created for the Miller family. The Joint Venture purchased property at the corner of Richmond Road and Man O' War Boulevard in Fayette County on which a shopping center was to be developed. The Joint Venture subsequently leased the property to MOW Place Ltd. (MOW Place), a Kentucky limited partnership which had as its sole general partner a limited partnership created in August, 1986, and known as Man O' War

Limited Partnership. This second limited partnership (Limited Partnership) is the focus of this litigation.

## I. The Limited Partnership

The Limited Partnership had the following stated purpose: "The purpose of the partnership is to enter into joint ventures and carry on the business of leasing real property and developing and operating shopping centers." Certificate of Limited Partnership, ¶ 2. The only general partners were Robert Miller and Lynwood Wiseman (General Partners). The limited partners were Harry Miller, Shirley Wiseman (now Lach) and Linda Poole Maggard. The Certificate of Limited Partnership provided that the partnership would not terminate upon the death, retirement or insanity of one General Partner (as provided by Kentucky statute) but rather the remaining General Partner would continue the business. Certificate of Limited Partnership, ¶ 13.

The accompanying Limited Partnership Agreement had the following provisions relevant to the present dispute:

2. (b) *Termination*

The Limited Partnership shall terminate upon the happening of any one of the following events: (i) agreement of both General Partners or [ii] August 1, 2036, whichever occurs first.

7. *Management, Duties and Restrictions.* During the continuance of this partnership, the rights and liabilities of the General Partners and Limited Partners respectively shall be as follows:

(a) The General Partners shall manage the Partnership business in all aspects, which shall include, but shall not be limited to, the following rights and duties: ...

* * * *

9. To take such other action, execute and deliver such other documents, and perform such other acts as the General Partners may deem necessary, appropriate, or incidental to carrying out the business and affairs of the Partnership.

(b) No Limited Partner shall have either the obligation or the right to participate in the management of the Partnership....

In early 1988, after a ten and one-half year marriage, Lach and Lynwood Wiseman divorced in a proceeding which she herself describes as "hotly contested." From that point forward, Robert Miller was the liaison or go-between who communicated with Lach about partnership matters. Correspondence over the next fourteen years reveals Lach closely monitored Limited Partnership affairs, including asking that documents be forwarded to her attorney and accountants as early as 1993. In September, 2001, Lach asked that the partners' monthly distribution be raised, suggesting $15,000 to $18,000 per month, and she inquired about a $300,000 "Advance to Wiseman Homes" appearing on the financial reports. The latter inquiry ultimately led to the discovery in 2002 that Keith Cunningham, Lynwood's nephew who had been entrusted with management responsibilities in several of Wiseman's businesses, including the Limited Partnership, had stolen in excess of $250,000 from the Limited Partnership. Lynwood paid back all of the stolen funds with interest, making the Limited Partnership whole, and also stepped down as manager of the shopping center.[1] A professional management company was retained at that time and continues to provide day-to-day management of the shopping center.

---

1. Although Lach addresses this issue, there was no evidence of impropriety by the General Partners and she did not pursue any claims based on this incident.

The year 2002 proved to be a watershed year for the Limited Partnership. Robert Miller died on August 18, 2002. A previously treated cancer had returned in March, 2002, and without any prospect of recovery, Miller, anticipating his imminent death, set about planning for the continuation of the Limited Partnership. As previously noted, the Certificate of Partnership allowed the Limited Partnership to continue under the direction of one General Partner but that one remaining partner was Lynwood Wiseman, an 81 year-old man with his own serious health problems. Also, Robert Miller knew that the acrimonious relationship between Wiseman and his ex-wife, Lach, would make conducting partnership affairs difficult and, more importantly, upon Lynwood's death, in the absence of another general partner, the Limited Partnership would dissolve as a matter of law. This would cause a domino effect in which MOW Place would then also dissolve as a matter of law because of the lack of a general partner (i.e. the Limited Partnership). This series of events could leave the Joint Venture without a lessee, Miller feared. The worst case scenario included a default on the Limited Partnership loan and serious tax consequences for all partners in the Limited Partnership.

Robert Miller proposed avoiding this chain of events by substituting his brother-in-law, Jeff Mullens (who had been a limited partner since 1986) and his son, Jonathan Miller (who had been a limited partner since 1988) as general partners in his stead. This would result in three general partners, including the elderly Lynwood Wiseman. Lach was the only partner in the Limited Partnership who objected to this proposal and she countered with a proposal that her daughter, Sherri McVay (a lawyer who was not a Limited Partnership partner) be substituted for Mullens. All of the partners, except Lach, objected to this proposal. Thus 72.972% of the Limited Partnership interests favored Robert Miller's "succession plan" while 27.027% (Lach alone) favored Lach's plan.

After Lach rejected Miller's proposal in early April 2002, a law firm retained by the Limited Partnership's management proposed a transaction which would avoid Miller's concerns about the continued viability of the Limited Partnership. The law firm proposed two scenarios "with the goal of eliminating the ability of any one limited partner of the Limited Partnership to prevent any action of the Limited Partnership necessary to ensure it continues to be a going concern by voting against such action." All of the partners in the Limited Partnership, except Lach, agreed to a restructuring which was described by the law firm as follows:

> ... the Limited Partnership would form a limited liability company ("LLC") and transfer its interest as a general partner of M.O.W. Place, Ltd., a Kentucky limited partnership ("General Partner Interest"), to the LLC in exchange for an interest as a member of the LLC. Immediately thereafter, the general partners (Bob Miller and Lynwood Wiseman) of the Limited Partnership would terminate the Limited Partnership in accordance with Section 2(b) of the Limited Partnership Agreement and liquidate the Limited Partnership.

In the first restructuring scenario, the Limited Partnership would liquidate by distributing the LLC membership interest pro rata to each of the partners of the Limited Partnership. The end result of this transaction would be a reconstitution of the Limited Partnership as a limited liability company. The limited partners' veto power would be eliminated, but the economic interests of the partners would remain unchanged. Also, there

would be no tax consequences to the partners.

The Operating Agreement of the LLC would appoint Jonathan Miller, Jeff Mullens and Lynwood Wiseman as the managers of the LLC and would provide that the managers may only act on behalf of the LLC in accordance with the decision of a majority of the managers. The managers would be able to take any and all action on behalf of the LLC except that the managers would not be able to (i) merge the LLC with another entity, (ii) file a bankruptcy petition on behalf of the LLC, (iii) dissolve the LLC, or (iv) amend the Operating Agreement or Articles of Organization without the consent of a majority-in-interest of the members (based upon their economic interests in the LLC).

Any of the limited partners who refuse to sign the Operating Agreement would be treated as transferees of an interest in the LLC and would not be admitted as members of the LLC. As mere transferees, they would not have any voting rights with respect to the LLC, although they would have economic rights and be entitled to distributions from the LLC. The only way for a limited partner receiving an interest as a member of the LLC to receive voting rights with respect to the LLC would be to agree in writing to be bound by the provisions of the Operating Agreement.

This restructuring was accomplished with the creation of Man O' War Management LLC (the Limited Liability Company) on May 16, 2002. Lach received the same ownership percentage in the Limited Liability Company that she held in the Limited Partnership. However, because she refused to sign the Assignment tendered to her, she has no voting rights, simply economic rights including distributions. The Limited Partnership remained in existence until May 31, 2002, when it was dissolved by the General Partners as provided for in paragraph 2(b) of the Limited Partnership Agreement.

## II. Circuit Court Action

Lach brought suit alleging that the restructuring violated Kentucky law and that the General Partners had breached their fiduciary duties to her as a limited partner. She did not ask for a jury trial but sought to have the transaction "undone" and damages awarded. Both Lach and the defendants eventually moved for summary judgment. In oral findings of fact and conclusions of law, the trial court first addressed a document production issue. The court held that Lach, a limited partner, was not entitled to privileged attorney-client communications between the Limited Partnership and the law firm, analogizing Lach to a shareholder who similarly has no right to privileged communications. Then, noting that limited partnerships are "creatures of statute," the trial court found that the acts taken did not result in a conversion of the Limited Partnership in violation of KRS 275.370 entitled "Conversion of partnership or limited partnership to limited liability company." He further found no violation of KRS 362.190 because the business of the Limited Partnership was carried on just as it had been before, benefiting the same people but operating in a "different organizational structure." Finally, he found no breach of fiduciary duty because the actions (1) were expressly authorized by the Limited Partnership Agreement and (2) were undertaken for "sound business reasons." The trial judge found that Mr. Miller was gravely ill and "something had to be done." Further, he noted that the defendants had an obligation to act in the best interest of *all* partners and not one dissenter. He noted it was "unfortunate

that [the parties] could not agree but they couldn't." The trial judge entered a judgment granting the defendants' summary judgment motion on Counts I and II of the Complaint and denying Lach's motion regarding those counts.

### III. Court of Appeals

In an unanimous opinion, the Court of Appeals affirmed. The Court found no conversion within the meaning of KRS 275.370. Significantly, the Court of Appeals found no violation of KRS 362.490 for the following reasons:

> KRS 362.490 provided that a general partner could not undertake any action that would make it impossible to carry on the ordinary business of the partnership without the consent or ratification of all of the partners. We cannot conclude that the transfer of assets made it impossible for the partnership to carry on business because the partnership's interest as the sole general partner of M.O.W. was not simply funneled into the LLC, but was exchanged for an interest that made the partnership the sole member of the LLC. The purpose of the partnership was not limited to being the sole general partner of M.O.W., but included the leasing of real property and the development and operation of shopping centers. Also, the LLC and the partnership coexisted for a period of time before the partnership was terminated. At no time was the partnership without some form of asset. Therefore, we cannot conclude that the transfer violated KRS 362.490(2).

The Court summarily rejected Lach's fiduciary duty claims, noting there was no misrepresentation or concealment; she was never "frozen out" of the entity but had the same percentage share in the Limited Liability Company as in the Limited Partnership; and she received all she was entitled to upon termination of the Limited Partnership. The Court of Appeals concluded by finding Lach's allegations she had been improperly denied access to attorney-client communications between the Limited Partnership and counsel regarding the restructuring were moot as she had no viable legal claims.

### ANALYSIS

Proper resolution of this case begins with recognition of what makes a limited partnership a limited partnership. As a leading Kentucky commentator describes it:

> In a limited partnership, a member will be either a general partner or a limited partner. The status of a general partner is identical to that of a partner in a general partnership. However, the status of the limited partner differs substantially from a general partner in two ways. First, the limited partner's liability is limited to his contribution to the limited partnership. The limited partner, in this regard, is similar to a shareholder of a corporation in that he is insulated from the obligations and liabilities of the partnership to the extent they exceed his capital contribution. Second, in order to maintain the limited liability status, a limited partner is not allowed to participate in the management and control of the activities of the partnership. It is the general partner's responsibility to manage the business operations of the limited partnership.

Seiffert, *Kentucky Practice—Corporations,* § 1:4 (2008).

In Kentucky, the rights accorded a limited partner derive primarily from the parties' partnership agreement and the Kentucky Revised Statutes. Kentucky also recognizes the common law duty of good faith owed by each partner to each and every other partner. *See Axton v. Kentucky Bottlers Supply Co.,* 159 Ky. 51, 166 S.W. 776, 778 (1914) ("It is the duty of

each partner to act with the utmost good faith towards his copartners ... A person will not be permitted to benefit himself at the expense of the firm.")

## IV. There was no Conversion of the Limited Partnership in Violation of KRS 275.370

Lach first alleges that the restructuring which produced the Limited Liability Company violated KRS 275.370 because it was the conversion of a limited partnership to a limited liability company without consent of all partners, general and limited. Every court, including this one, has rightly rejected her argument. KRS 275.370(1) provides that a limited partnership "may be converted to a limited liability company pursuant to this section." The language is clearly permissive, denoting a legislative intent that limited partnerships have an option of proceeding under the statute but are not limited to restructuring as a limited liability company only pursuant to the statute.

Moreover, as the majority acknowledges, KRS 275.370 envisions a transformation of a single entity. Once all of the statutory steps are complied with and articles of organization are filed with the Secretary of State the registration of the limited partnership "shall be deemed cancelled ..." KRS 275.370(3)(e). Like the old phrase "the King is dead, long live the King", the statute provides for an uninterrupted succession—"the limited partnership is dead, long live the limited liability company." An uninterrupted succession or seamless transformation is not what happened in this case. As the trial court, the Court of Appeals and the majority recognizes, the Limited Liability Company was formed and existed concurrently with the Limited Partnership. Notably, the Limited Partnership was not created just to manage the Man O' War property but as quoted above to "enter into joint ventures and carry on the business of leasing

real property and developing and operating shopping centers." Thus, the transfer of the Limited Partnership's general partnership interest in MOW Place to the Limited Liability Company did not deprive the Limited Partnership of all of its lawful purpose. It could have continued to exist as a vehicle for leasing other real property or developing and operating other shopping centers, albeit an unlikely scenario given the status of relations between Lach and the other parties. Regardless, the permissive language of KRS 275.370 and the inescapable fact that the Limited Partnership and Limited Liability Company legally existed simultaneously preclude any argument that the Limited Partnership was improperly converted to a limited liability company. While Robert Miller may have occasionally used the word "conversion" in discussing the restructuring, he plainly misspoke because there was no conversion as a matter of law. KRS 275.370 was not violated.

## V. KRS 362.490 Was Not Violated by the Restructuring Because the Business of the Limited Partnership Continued in a Different Form with the Same Participants

In 1986, KRS 362.490 provided in relevant part:

> Rights, powers and liabilities of a general partner.
>
> A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to ...
>
> * * * *
>
> (2) Do any act which would make it impossible to carry on the ordinary business of the partnership, ...

Kentucky's Uniform Limited Partnership Act, adopted in 1970, was amended in 1988 with the passage of the Revised Uniform Limited Partnership Act (and revised again in 2006). Although different statutory provisions are applicable in the 1970 and 1988 versions, the gist is the same, *i.e.*, general partners cannot, without the consent of all partners, do any act which would make it "impossible to carry on the ordinary business of the partnership."

Lach proposes and the majority accepts the proposition that this statute means feuding partners must remain locked together in a dysfunctional limited partnership without recourse to other business entities for carrying on their business even if the general partners are expressly authorized to simply dissolve the limited partnership and to "take such other action, execute and deliver such other documents, and perform such other acts as the General Partners may deem necessary, appropriate, or incidental to carrying on the business and affairs of the Partnership." Limited Partnership Agreement, ¶ 7(a)(9). This wholly illogical conclusion is premised on cases which are so distinguishable from this case as to be irrelevant.

In *Gundelach v. Gollehon*, 42 Colo.App. 437, 598 P.2d 521 (1979), Gundelach was a limited partner in a limited partnership created for the stated purpose of acquiring, owning, managing, improving and leasing a particular 112 acre parcel of land in Perry Park and to engage in business activities related "or incidental thereto." When the general partners saw an opportunity to combine their interests from three separate limited partnerships to obtain a more appealing parcel of property in Perry Park, they sought approval from the various limited partners for a consolidation of the three partnerships. Gundelach refused to consent but the transaction proceeded anyway and the very piece of property which Gundelach had invested in through the purchase of his limited part-

nership interest was deeded over to the seller of the allegedly more lucrative property. In that case, the Colorado Court of Appeals understandably concluded that the general partners had undertaken an act which made it impossible to carry on the ordinary business of the partnership. As noted, the ordinary business of that particular partnership was the purchase, development and lease of the specific 112 acre parcel which the General Partners sold off to a third party. Here, Lach's interest was in a limited partnership whose purpose was not limited to operation of a particular property but, more importantly, the Man O' War property which had been the focus of the partnership, remained with the Limited Liability Company and provided Lach with income in the exact percentage of ownership as she had held in the Limited Partnership. Clearly, *Gundelach* is factually distinguishable. As the Court of Appeals found, in this case the same business was being conducted before and after the restructuring, just through a different legal entity.

*Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057 (2nd Cir.1977) is exceedingly more complex but just as distinguishable. While the case started as a securities churning case, antitrust and partnership fiduciary duty counterclaims were added, some of which were subject to the ancillary jurisdiction of the federal district court. Two limited partners in the Newburger, Loeb partnership alleged that two recently admitted general partners, two outside consultants, in-house and outside legal counsel and others conspired to transform the partnership into a corporation and to gain control of its assets for a small investment. 563 F.2d at 1062. When the limited partners refused to agree to the transfer of partnership assets to the corporation, the defendants allegedly threatened two separate lawsuits, one for securities churning and

one for fraudulently inducing the recently admitted general partners to invest in Newburger, Loeb. The limited partners alleged other coercive tactics were also employed. The district court found the transfer of the partnership assets was a violation of New York Partnership law prohibiting acts that would make it "impossible to carry on the ordinary business of the partnership." In the trial judge's words, the defendants were part of a plot to "take over the new operation on a shoestring and directly enrich themselves." 563 F.2d at 1067. Against this backdrop the Second Circuit stated:

> .... However, there is simply no language in the Partnership agreement that can be construed as granting the general partners the right to conduct the February 11 transfer; indeed, this is the precise conclusion reached by the Rosenman, Colin memorandum of January 25, 1971 discussed supra. The February 11 transfer did not merely terminate the Partnership (which, in fact, is what Gross, Bleich and Donoghue sought by liquidation), it transferred all of the Partnership assets, including the capital interests of Bleich and Donoghue, to an entirely new entity, with new management and different rights between the parties. This drastic change in the rights and relations of the parties went far beyond any powers granted the general partners to terminate or manage the business....

*Id.* at 1075. Without question, *Newburger, Loeb* is distinguishable. Not only were threats and coercive tactics used, but most importantly the partnership agreement did not grant the general partners the authority to engage in the challenged transaction and the result was a "drastic change in the rights and relations of the parties...." Interestingly, the *Newburger, Loeb* court cited in contrast *Mist Properties, Inc. v. Fitzsimmons Realty Co.*, 228 N.Y.S.2d 406

(Sup.Ct.1962), a case in which a transfer of partnership assets was held not to violate the same New York Partnership law because the partnership agreement allowed the general partners to terminate the partnership at any time and delegated to them the authority to manage the business. Again, the *Newburger, Loeb* court emphasized that there was no language in the Newburger, Loeb partnership agreement which authorized the machinations of the defendants and there was no credible argument that "the transfer was 'necessary' to enable the Partnership to carry on its business...." 563 F.2d at 1075.

In this case, as in *Mist Properties*, the parties' limited partnership agreement allowed for the actions taken by the general partners. They had the authority to undertake actions "necessary, appropriate, or incidental to carrying out the business and affairs of the [Limited] Partnership" and the authority to dissolve the Limited Partnership. There was no act that made it "impossible" to carry on the business of the Limited Partnership. Indeed, it is still being carried on through the Limited Liability Company for Lach's benefit and all the other partners' benefit in the same proportionate interests as existed in the Limited Partnership. The same business is simply being carried on in another legally authorized (and most would acknowledge significantly superior) legal form. There is no credible basis for finding that KRS 362.490 was violated.

## VI. There Was No Breach of Fiduciary Duty.

After discussing *Gundelach, Newburger, Loeb,* and *Mist Properties,* the majority states:

> Simply put, we find that the general partner's (sic) rights under the partnership agreement to (1) terminate the partnership at any time upon agreement of the general partners,

and (2) to act upon behalf of the Partnership in matters that are "necessary, appropriate, or incidental to carry out its business," can be not construed to allow them the power to transform the partnership into a limited liability company, in order to favor a majority of the partners in their selection, or substitution, of the general partners/managers of the business, without the approval of all the limited partners.

No authority is cited for this statement because it is simply a pronouncement, one which does not flow from the aforementioned cases. Having pronounced that the Limited Partnership Agreement cannot be construed to allow the formation of the Limited Liability Company, the majority proceeds to find the transfer of the partnership assets to the Limited Liability Company and the restructuring of the business to be breaches of fiduciary duties, again without citation to anything other than general fiduciary duty cases having no comparison to the facts before this Court. *See, Axton v. Kentucky Bottlers, supra,* (involving a partner who cancelled partnership contracts and diverted opportunities to his new competing business); *Anthony v. Padmar, Inc.,* 320 S.C. 436, 465 S.E.2d 745 (App.1995) (sale of partnership assets to a third party upheld but general partners liable for failing to receive the majority vote required by the partnership agreement and for breach of fiduciary duty by "intentionally failing to disclose information, misrepresenting and manipulating the voting process" and mishandling the sale); *VanHooser v. Keenon,* 271 S.W.2d 270 (Ky.1954) (five partners who engaged in self-dealing were forced to account to their partners for money obtained on an option which rightfully belonged to the entire partnership).

After this the majority throws it all back to the trial judge with directions to determine a remedy. Typically, a breach of fiduciary duty in the partnership context results in an accounting (because profits, assets or opportunities have been diverted) or simply damages (again for the profits lost or losses incurred as a result of the breach.) *Bromberg and Ribstein on Partnership* ¶ 16.07(i) (2005) (collecting cases illustrating remedies including accounting, damages, refund of partnership contributions, compelled transfers and the setting aside of "conflict" transactions).[2] Here, there is no allegation of monetary damage because the Limited Liability Company is as successful as the Limited Partnership. The only thing Lach lost in the restructuring, the only thing, was her personal choice for General Partner, a choice unacceptable to the holders of 72.972% of the Limited Partnership interests.

The majority apparently thinks it only fair that Lach have had her choice as to one of the three general partners and thus declares a fiduciary duty was breached. There is absolutely no legal basis for this conclusion. Were the General Partners supposed to ignore their own best business judgment and the wishes of all other partners in the Limited Partnership about the identity of the new General Partners? Would that not have been a breach of fiduciary duties to the other seven limited partners who disagreed with Lach and who held 39.5223% as opposed to Lach's 27.0270% of the Limited Partnership? Were the General Partners supposed to ignore those limited partners and favor Lach? Apparently so, but why?

In short, the majority finds a breach of fiduciary duty where there is none, and then sends the case back to the trial judge to fashion a remedy. But first—what are

---

**2.** Notably, there is no case in the fiduciary duty section of *Bromberg and Ribstein on Part-* *nership* comparable to the one before this Court.

Lach's legally cognizable damages? Does not getting your choice for General Partner because all the other partners disagree constitute damage? Assuming in some topsyturvy world this constitutes damage, what is it worth? Surely, there is no purer form of speculation. The majority's breach of fiduciary duty pronouncement on these facts is not only legally unsound, it leads to a virtual "Alice in Wonderland" world of remedies.

To the extent the majority would concede that Lach could not force her choice for General Partner on the other partners but argues that the General Partners had a fiduciary obligation to continue negotiating the issue with her, what about the indisputable facts? Time was of the essence. In April, 2002, Robert Miller was dying; he passed away approximately 90 days after the May, 2002 restructuring following weeks of hospice care for liver cancer. Without an agreement on the new General Partner(s) or the restructuring, the elderly Lynwood Wiseman (who himself died during the pendency of this case) would have been the only surviving General Partner. In Robert Miller's words from a March, 2002, letter, "[Lach] hates Lynwood passionately; their divorce lawsuit lasted for years and years after they were technically divorced." Was Robert Miller supposed to relegate the other partners to an easily foreseeable and similarly protracted fight waged by Lach and Lynwood Wiseman? How long were the General Partners (particularly Miller) supposed to negotiate before resorting to other legal means that would protect the greater interest of the Limited Partnership and the interests of the other partners? It is simply legally unjustified to look at the facts that existed and "divine" that the General Partners breached their fiduciary duties to Shirley Lach. Indeed, they did exactly what their fiduciary duties demanded of them—they exhibited the utmost good faith to all the parties and acted in the best interests of the entire Limited Partnership by undertaking the restructuring, resulting in a profitable Limited Liability Company.

### CONCLUSION

The restructuring did not violate KRS 275.370 or KRS 362.490. Moreover, it was a permissible action undertaken by the General Partners in the interest of *all* partners and was not a breach of any fiduciary duties. The Fayette Circuit Court and the Court of Appeals should be affirmed.

MINTON, J., joins.